This opinion is uncorrected and subject to revision before
publication in the New York Reports.
--------------------------------------------------------------------

No. 40
In the Matter of Kevin B.
Acevedo,
            Appellant,
        v.
New York State Department of
Motor Vehicles, et al.,
            Respondents.
----------------------------
No. 41
In the Matter of Michael W.
Carney,
            Appellant,
        v.
New York State Department of
Motor Vehicles, et al.,
            Respondents.
----------------------------
No. 42
In the Matter of Caralyn A.
Matsen,
            Appellant,
        v.
New York State Department of
Motor Vehicles, et al.,
            Respondent.
Case No. 40:
        Eric H. Sills, for appellant.
        Jeffrey W. Lang, for respondents.

Case No. 41:
        Eric H. Sills, for appellant.
        Jonathan D. Hitsous, for respondents.

Case No. 42:
        Eric H. Sills, for appellant.
        Jeffrey W. Lang, for respondents.

GARCIA, J.:

Following their most recent drunk driving convictions -- the third for petitioners Kevin B. Acevedo and Caralyn A. Matsen, and the sixth for petitioner Michael W. Carney -- petitioners' driver's licenses were revoked pursuant to the

Vehicle and Traffic Law.  Petitioners' relicensing applications were subsequently denied pursuant to recent amendments adopted by respondent New York State Department of Motor Vehicles (DMV), which govern the relicensing of recidivist drunk driving offenders.[1]  Petitioners now challenge the validity of those regulations and seek restoration of their driving privileges.

For the reasons set forth below, we reject petitioners' challenges and affirm.

I.

"The carnage caused by drunk drivers is well documented" and "occurs with tragic frequency on our Nation's highways" (South Dakota v Neville, 459 US 553, 558 [1983]).  "Drunk drivers take a grisly toll on the Nation's roads, claiming thousands of lives, injuring many more victims, and inflicting billions of dollars in property damage each year" (Birchfield v North Dakota, 579 US ___, ___, 136 S Ct 2160, 2166 [2016]).  In New York alone, alcohol-related motor vehicle accidents are responsible for more than 300 deaths -- nearly 30% of fatal crashes -- and over 6,000 injuries each year (NY Reg, March 13, 2013, at 43).

An alarming percentage of these tragedies involve

---

[1] Unless otherwise noted, a "drunk driving offense" refers to any "alcohol- or drug-related driving conviction or incident" as defined in 15 NYCRR 136.5 (a) (1), and a "drunk driving offender" refers to any individual whose driving record contains one or more "alcohol- or drug-related driving conviction or incident."

recidivist offenders.  In 2010, for instance, 28% of the alcohol-related crashes resulting in injury involved a driver with three or more drunk driving convictions (id.).  Approximately 17,500 drivers with three or more drunk driving convictions have been involved in at least one crash resulting in death or injury, and according to DMV, the number of accidents involving this group of recidivists continues to increase (id.).  For nearly two decades, the recidivism rate among drivers with drunk driving convictions has remained above 20% (Institute for Traffic Safety Management and Research [October 2016]).

### Statutory Background

To combat this persistent threat to public safety, the Legislature has enacted a statutory scheme that criminalizes drunk driving (VTL § 1192) and sets forth the sanctions -- including licensing implications -- associated with alcohol- and drug-related violations (VTL § 1193).  Under the Vehicle and Traffic Law, a conviction for a drunk driving offense generally results in the automatic revocation of the offender's driver's license, requiring the offender to reapply for a new license. The most common type of revocation is followed by a "minimum" time period -- usually 6-18 months -- during which the offender is ineligible for a new license (VTL § 1193 [2] [b]).

The VTL mandates "[p]ermanent revocation" for certain recidivist offenders -- for instance, those who have three drunk-driving convictions in four years, or four drunk driving

convictions in eight years (VTL § 1193 [2] [b] [12]).  Permanent revocation renders an offender ineligible for relicensing, absent a waiver.  Under the VTL, permanent revocation "shall be waived" after a fixed period of time -- either five or eight years, depending on the offender's conduct -- and upon satisfaction of specified conditions, "[p]rovided, however, that the commissioner [of the DMV] may, on a case by case basis, refuse to restore a license which otherwise would be restored . . . in the interest of the public safety and welfare" (VTL § 1193 [2] [b] [12] [b]; see also VTL § 1193 [2] [b] [12] [e]).

As a general matter, once an offender's license has been revoked -- permanently or otherwise -- reissuance of a new license is subject to the discretion of the Commissioner of the DMV (the Commissioner) (VTL § 510 [6] [a]; VTL § 1193 [2] [c]).  Specifically, "where a license is revoked" pursuant to VTL § 1193 (2) (b), "no new license shall be issued after the expiration of the minimum period specified . . . *except in the discretion of the commissioner*" (VTL § 1193 [2] [c] [emphasis added]).  The Commissioner's discretion to reissue a new license -- following the prescribed statutory revocation period -- is limited only if specified; for instance, the Commissioner is barred from issuing a new license to an offender who has two drunk driving convictions resulting in physical injury to another person (VTL § 1193 [2] [c] [2]-[3]).

Regulatory Scheme

The Vehicle and Traffic Law authorizes the Commissioner to, "[s]ubject to and in conformity with the provisions of the vehicle and traffic law . . . enact, amend and repeal rules and regulations which shall regulate and control the exercise of the powers of the [DMV] and the performance of the duties of officers, agents and other employees thereof" (VTL § 215). This authority includes the power to "promulgate regulations" with respect to the administration of licensing procedures (VTL § 508 [4]).

The Commissioner first promulgated regulations to address post-revocation relicensing in 1980. Those regulations specified that DMV would decline to issue a new license to an applicant who had (i) a "history of abuse of alcohol or drugs . . . with insufficient evidence of rehabilitation" (15 NYCRR former 136.4 [a] [2]), or (ii) accumulated twenty-five or more "negative safety points" -- corresponding to certain VTL violations -- within the three years immediately preceding the application (15 NYCRR former 136.4 [a] [3]; 15 NYCRR former 136.1 [b] [6]).

DMV has amended the 1980 regulations a number of times over the years -- including in 1982, 2006, and 2011. In 2011, for instance, the regulations were amended to provide that, in considering relicensing applications, DMV would evaluate an applicant's "entire driving history" for purposes of determining

whether the applicant was a "problem driver" who created "an unusual and immediate risk upon the highways" (15 NYCRR former 136.1 [b] [1]).  If so, DMV would deny the application and decline to consider a further application for one year following the denial (15 NYCRR former 136.4 [b]).

According to DMV, the 2011 amendments remained inadequate to address the safety risk posed by recidivist drunk drivers, and DMV's statistics indicated that a small number of relicensed recidivist drunk drivers remained responsible for a disproportionate number of accidents.  In early 2012, DMV "began an extensive review of the processes and criteria used when making relicensing decisions, particularly as they apply to persons applying for relicensing after being revoked for an alcohol- or drugged-driving related offense" (NY Reg, March 13, 2013, at 46).  In February 2012, "[i]n the interest of ensuring that drivers with similar records would be treated uniformly," DMV began holding pending relicensing applications in abeyance if the applicant's record "contained multiple alcohol-related violations of the Vehicle and Traffic Law" (id.).

The amendments at issue in these appeals (the Regulations) were adopted as emergency regulations in September 2012 and took effect immediately.  In relevant part, the Regulations provide that, "[u]pon receipt of a person's application for relicensing, the Commissioner shall conduct a lifetime review of such person's driving record" (15 NYCRR 136.5

[b]).  The Commissioner "shall deny the application" if "the record review shows that": (1) the applicant has "five or more alcohol- or drug-related driving convictions or incidents in any combination within his or her lifetime," (15 NYCRR 136.5 [b] [1]) or (2) within a "25 year look back period," the applicant "has three or four alcohol- or drug-related driving convictions or incidents in any combination" and "one or more serious driving offense" (15 NYCRR 136.5 [b] [2]).[2]  A "serious driving offense" includes: (i) "a fatal accident"; (ii) "a driving-related Penal Law conviction"; (iii) "conviction of two or more violations for which five or more points are assessed" on the applicant's driving record; or (iv) "20 or more points from any violations" (15 NYCRR 136.5 [a] [2]).

        For applicants with "three or four alcohol- or drug-related driving convictions or incidents in any combination within the 25 year look back period but no serious driving offenses within the 25 year look back period," the Regulations provide that the Commissioner "shall deny the application for at least five years" in addition to the minimum statutory revocation period (15 NYCRR 136.5 [b] [3]).  Following the expiration of this five-year waiting period, "the Commissioner may in his or her discretion approve the application, provided that upon such

_____

        [2] The "25 year look back period" encompasses "the period commencing upon the date that is 25 years before the date of the revocable offense and ending on and including the date of the revocable offense" (15 NYCRR 136.5 [a] [3]).

approval, the Commissioner shall impose the A2 restriction on such person's license for a period of five years and shall require the installation of an ignition interlock device in any motor vehicle owned or operated by such person for such five-year period" (id.).  An A2 restricted license is limited to operation to and from specified destinations -- for instance, "the holder's place of employment or education" (see 15 NYCRR 135.9 [b]; 15 NYCRR 3.2 [c] [4]).

The Commissioner is expressly permitted to "deviate from the general policy" set forth in the Regulations "in the exercise of discretionary authority granted" under the VTL (15 NYCRR 136.5 [d]).  Specifically, the Commissioner may approve a relicensing application based on a showing of "unusual, extenuating and compelling circumstances," in which case "the applicant may be issued a license or permit with a problem driver restriction . . . and may be required to install an ignition interlock device" (id.).

### Petitioners' Challenges

Petitioners' driver's licenses were revoked pursuant to VTL § 1193 (b), and their respective relicensing applications were decided in accordance with the Regulations.

Petitioner Kevin Acevedo was convicted of three drunk driving offenses between 2003 and 2008.  Each time, his license was revoked.  Acevedo's most recent conviction triggered a one-year statutory revocation period, after which he applied for

relicensing for the third time, in October 2011.  In February 2012, Acevedo received a letter from DMV indicating that he had been approved to apply for a driver's license, subject to passing written and road tests.  Three days later, DMV withdrew its approval and notified Acevedo that his application would be subjected to additional review.  Eventually, in November 2012, Acevedo's application was denied pursuant to the Regulations; under 15 NYCRR 136.5 (b) (3), Acevedo's application would be denied for at least five years following the expiration of his statutory revocation period, and he would then become eligible to apply for an A2 restricted license with the requirement that he install an ignition interlock device.

Petitioner Michael Carney has been convicted of six drunk driving offenses.  Following his most recent conviction in 2011, Carney's driver's license was revoked for the third time and he incurred a six-month statutory revocation period.  Carney again applied for relicensing in June 2012.  His application was held in abeyance pending the anticipated enactment of the Regulations, and was ultimately denied pursuant to 15 NYCRR 136.5 (b) (1), as Carney had "five or more" drunk driving convictions in his lifetime.

Petitioner Caralyn Matsen accumulated three drunk driving convictions between 2000 and 2010.  She also received twelve points on her driving record based on two separate speeding incidents in 2004.  In March 2012 -- following her 2010

drunk driving conviction and a one-year statutory revocation period -- Matsen again applied for relicensing. DMV initially held her application in abeyance, and then in November 2012, Matsen's application was denied pursuant to 15 NYCRR 136.5 (b) (2). Given her three drunk driving offenses and her two six-point speeding violations -- which, together, constituted a "serious driving offense" -- Matsen's driving record triggered a presumptive lifetime denial.

Petitioners appealed the denial of their respective relicensing applications to the Administrative Appeals Board, which affirmed DMV's denial of their applications. Petitioners then filed the instant suits, challenging the lawfulness of the Regulations as well as the application of the Regulations to each petitioner's relicensing application. Supreme Court dismissed each proceeding, and petitioners appealed.

The Appellate Division affirmed each case in split decisions (Matter of Acevedo v New York State Dept. of Motor Vehs., 132 AD3d 112 [3d Dept 2015]; Matter of Carney v New York State Dept. of Motor Vehs., 133 AD3d 1150 [3d Dept 2015]; Matter of Matsen v New York State Dept. of Motor Vehs., 134 AD3d 1283 [3d Dept 2015]). The Appellate Division panels determined that DMV did not exceed its regulatory authority because "it did not act on its own ideas of public policy, but rather implemented the Legislature's policies of promoting highway safety" (Acevedo, 132 AD3d at 119), and because the Regulations represented "an

appropriate discretionary determination by the Commissioner"
(Carney, 133 AD3d at 1152-1153).  The court also held that the
Regulations do not conflict with the Vehicle and Traffic Law, and
that they were not impermissibly applied retroactively to
petitioners' applications.

The dissenting Justices -- two in Acevedo and Carney,
and one in Matsen -- argued that the Commissioner "exceeded the
scope of her regulatory authority" by "abdicat[ing] her statutory
mandate to exercise her discretion" on a case-by-case basis "in
favor of a hard and fast rule, waivable only under extremely
limited circumstances" (Acevedo, 132 AD3d at 123, 125 [Lynch, J.,
dissenting]; see also Carney, 133 AD3d at 1155 [Lynch, J.,
dissenting]; Matsen, 134 AD3d at 1287 [Lynch, J., dissenting]).

These appeals ensued, and we now affirm.

II.

Initially, DMV contends that petitioners lack standing
to the extent that they challenge provisions of the Regulations
that are inapplicable to their respective relicensing
applications.  A court can act "only when the rights of the party
requesting relief are affected" (Society of Plastics Indus. v
City of Suffolk, 77 NY2d 761, 772 [1991]), and therefore a
controversy is not justiciable unless the party requesting relief
has "an interest sufficient to constitute standing to maintain
the action" (American Ins. Assn v Chu, 64 NY2d 379, 383 [1985]).
Each petitioner must therefore show the existence of an "injury

in fact" in order to demonstrate that he or she has "an actual legal stake in the matter being adjudicated" (<u>Society of Plastics Indus.</u>, 77 NY2d at 772). To constitute an injury in fact, petitioners' claimed harm must be "direct and immediate" such that it cannot be "prevented or significantly ameliorated by . . . administrative action or by steps available to the complaining party" (<u>Church of St. Paul & St. Andrew v Barwick</u>, 67 NY2d 510, 520 [1986]).

### A.

Plainly, petitioners will not incur any harm -- let alone any direct or immediate harm -- as a result of those provisions of the Regulations that are not applicable to their respective relicensing applications. Accordingly, each petitioner has standing only to challenge those aspects of the Regulations that are triggered by his or her application.

Collectively, however, petitioners have standing to challenge the most salient provisions of the Regulations implicated by these appeals: petitioner Carney has "five or more" drunk driving offenses and is subject to a lifetime denial (15 NYCRR 136.5 [b] [1]); petitioner Matsen has "three or four" drunk driving offenses, plus a "serious driving offense," within the 25 year look back period and is subject to a lifetime denial (15 NYCRR 136.5 [b] [2]); and petitioner Acevedo has "three or four" drunk driving offenses, but no "serious driving offense," within the 25 year look back period and is subject to a five-year

waiting period (15 NYCRR 136.5 [b] [3]).

### B.

With respect to petitioner Acevedo, DMV further contends that his appeal is entirely nonjusticiable, even with respect to 15 NYCRR 136.5 (b) (3). Specifically, DMV argues that Acevedo's five-year waiting period has now expired, and that the restricted license provision -- which is generally triggered following the five-year waiting period -- was inapplicable at the time Acevedo brought his claim. We agree with the Appellate Division that Acevedo does not have standing to challenge the restricted license provision of 15 NYCRR 136.5 (b) (3), but reject DMV's contention that Acevedo's challenge to the waiting period provision is moot.

Accordingly, we review petitioner Carney's challenge to 15 NYCRR 136.5 (b) (1), petitioner Matsen's challenge to 15 NYCRR 136.5 (b) (2), and petitioner Acevedo's challenge to the five-year waiting period provision of 15 NYCRR 136.5 (b) (3).

### III.

Turning to the merits, petitioners raise a number of challenges to the Regulations, arguing that the Regulations (i) conflict with statutory provisions of the Vehicle and Traffic Law; (ii) violate the separation of powers doctrine; (iii) are arbitrary and capricious; and (iv) were improperly applied retroactively to petitioners' relicensing applications.

Statutory Conflict

Petitioners argue that the Regulations conflict with the Vehicle and Traffic Law, and because an agency may not adopt regulations that are "inconsistent with [] statutory language" (Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib., 2 NY3d 249, 254 [2004]), the Regulations cannot stand.  We disagree.

Petitioners' statutory conflict argument relies on the flawed premise that an offender is *entitled* to relicensing under the VTL upon expiration of the statutory revocation period. Rather, the VTL expressly provides that the statutory revocation periods are "minimum" time periods during which an offender's driver's license must remain "revoked" (VTL § 1193 [2] [b]). With respect to the "[r]eissuance of licenses," the VTL provides that, following "the expiration of the minimum [revocation] period," relicensing applications are to be decided solely "in the discretion of the commissioner" (id. § 1193 [2] [c]).  By design, then, the statutory scheme contemplates that the Commissioner will have exclusive authority over post-revocation relicensing, and that those relicensing determinations will be discretionary.

We similarly reject petitioners' contention that VTL § 1193 (2) (b) (12) (b) mandates relicensing where an offender otherwise qualifies for a waiver of permanent revocation under that provision.  While VTL § 1193 (2) (b) (12) (b) provides that

permanent revocation "shall be waived" under specified circumstances, that statutory mandate remains subject to the discretion of the Commissioner, who "may, on a case by case basis, refuse to restore a license which otherwise would be restored . . . in the interest of the public safety and welfare" (VTL § 1193 [2] [b] [12] [b]).  Moreover, petitioners' reading of VTL § 1193 (2) (b) (12) (b) would accord the Commissioner latitude to exercise direction in the vast majority of relicensing determinations, while mandating relicensing -- eliminating the Commissioner's discretion -- for the most dangerous subset of drunk driving offenders, i.e. those subject to statutory permanent revocation.  We decline to interpret the VTL in such an implausible manner.  Rather, we read VTL § 1193 (2) (b) (12) (b) to provide that the Commissioner may, in her discretion, consider a relicensing application from an offender who is otherwise qualified for a waiver, notwithstanding that offender's permanent revocation.

Petitioners also argue that the Commissioner has contravened her statutory mandate to exercise discretion on a case by case basis by adopting hard and fast rules that are waivable only under limited circumstances.  But contrary to petitioners' claim, the Commissioner does not abdicate her discretion by formalizing it.  By promulgating rules to govern relicensing, the Commissioner ensures that her discretion is exercised consistently and uniformly, such that similarly-

situated applicants are treated equally.  The Regulations also provide notice to the public concerning the Commissioner's general practices with regard to relicensing.  And in any case where the presumptive provisions of the Regulations are, in the Commissioner's discretion, inappropriate in light of "unusual, extenuating and compelling circumstances," the Commissioner may, pursuant to the Regulations, "deviate from the general policy" (15 NYCRR 136.5 [d]).

Nor do the look back periods contained in the Regulations conflict with any shorter look back period prescribed by statute.  For instance, VTL § 1193 (2) (b) uses specified look back periods -- generally 10 or fewer years -- in order to set minimum revocation periods during which the Commissioner is not authorized to grant an offender's relicensing application.  Once that statutory revocation period has expired, the Commissioner is authorized to determine whether relicensing is warranted in her discretion.  The Commissioner's use of a longer look back period for purposes of evaluating relicensing applications falls squarely within her broad relicensing authority (VTL § 1193 [2] [c]), and creates no conflict with other statutory look back periods employed for other purposes.

## Separation of Powers

Petitioners next contend that the Regulations amount to legislative policymaking -- not administrative rulemaking -- in violation of the separation of powers doctrine.  "[T]he

separation of powers doctrine gives the Legislature considerable leeway in delegating its regulatory powers" to an administrative agency to "administer the law as enacted by the Legislature" (Boreali v Axelrod, 71 NY2d 1, 9-10 [1987]).  As a "creature of the Legislature," an agency "is clothed with those powers expressly conferred by its authorizing statute, as well as those required by necessary implication" (Matter of City of New York v State of N.Y. Commn. on Cable Tel., 47 NY2d 89, 92 [1979]).  To that end, an agency is permitted to adopt regulations that go beyond the text of its enabling legislation, so long as those regulations are consistent with the statutory language and underlying purpose (Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib., 2 NY3d 249, 254 [2004]).

The scope of authority delegated to the Commissioner, particularly with regard to licensing, is broad.  The Commissioner has the express authority to issue driver's licenses (VTL § 501 [1]), to suspend or revoke driver's licenses (VTL § 510 [1]), and to decide whether to grant or deny relicensing applications (VTL § 510 [6] [a]), including those applications involving alcohol- or drug-related revocations (VTL § 1193 [2] [c] [1]).

With respect to license revocation and reissuance, the VTL confers discretionary authority on the Commissioner in a number of ways.  For instance, following a permanent license

revocation, the Commissioner may refuse to restore an applicant's license "in the interest of the public safety and welfare," even if the applicant is otherwise qualified for a permanent revocation waiver (VTL § 1193 [2] [b] [12] [b]; VTL § 1193 [2] [b] [12] [e]).  In the context of relicensing determinations following an alcohol- or drug-related revocation, the VTL makes clear that reissuance is -- in all cases -- subject only to the "discretion of the commissioner" (VTL § 1193 [2] [c]).

But no matter how facially broad, the legislature's grant of authority "must be construed, whenever possible, so that it is no broader than that which the separation of powers doctrine permits" (Boreali, 71 NY2d at 9).  We have made clear that the legislature "cannot cede its fundamental policy-making responsibility to an administrative agency" (id.).  Nor may an agency use its enabling statute "as a basis for drafting a code embodying its own assessment of what public policy ought to be" (id.).  To be sure, "it is the province of the people's elected representatives, rather than appointed administrators, to resolve difficult social problems by making choices among competing ends" (id. at 13).

Our separation of powers analysis is guided by the four factors set forth in Boreali v Axelrod (71 NY2d 1 [1987]).  These four factors -- or "coalescing circumstances" -- are not "discrete, necessary conditions that define improper policymaking by an agency," nor are they "criteria that should be rigidly

applied in every case in which an agency is accused of crossing the line into legislative territory" (Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene, 23 NY3d 681, 696 [2014]). Rather, the factors are related considerations, designed to ascertain whether an agency has transgressed the bounds of permissible rulemaking (id. at 696-697).

### A.

The first Boreali factor examines whether the agency merely "balance[d] costs and benefits according to preexisting guidelines," or instead made "value judgments entailing difficult and complex choices between broad policy goals to resolve social problems" (Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn., 25 NY3d 600, 610 [2015] [internal quotation marks and citation omitted]). Balancing of costs and benefits is inherent in any rulemaking process, and our separation of powers jurisprudence should not be interpreted to foreclose an agency from considering the implications of its proposals (Matter of New York Statewide Coalition of Hispanic Chambers of Commerce, 23 NY3d at 697-698). Indeed, an agency would be "acting irrationally" if it "adopted a particular rule without first considering whether its benefits justify its societal costs" (id. at 697). Here, to be sure, DMV "deliberated extensively" regarding the most "expeditious, effective and fair" means of addressing the ongoing problem of drunk driving, and assessed

the costs and benefits associated with each proposed alternative (NY Reg, March 13, 2013, at 46).

But the ultimate aim of the Regulations -- the legislative policy goal -- is both well-established and widely shared: protecting the public from the dangers of recidivist drunk driving.  The legislature, not DMV, made a value judgment between competing ends, concluding that public safety may outweigh the licensing interests of recidivist drunk driving offenders.  The legislature has also expressed a clear intention to delegate broad authority to DMV to decide post-revocation relicensing applications, leaving all reissuance determinations subject to the "discretion of the commissioner" (VTL § 1193 [2] [c]).

Moreover, to the extent the Commissioner chose among competing ends in enacting the Regulations, those choices were not very difficult or complex, given their direct connection to public safety (see Matter of New York Statewide Coalition of Hispanic Chambers of Commerce, 23 NY3d at 699).  Given the widespread acceptance of their underlying ends, the Regulations do not "raise difficult, intricate, and controversial issues of social policy" (id.).  Nor do they interfere with matters of personal autonomy; although driving may implicate a "commonplace daily activit[y] preferred by large numbers of people" (Greater N.Y. Taxi Assn., 25 NY3d at 612), *drunk* driving -- the problem targeted by the Regulations -- does not.

B.

The second Boreali factor considers whether the agency wrote on "a clean slate, creating its own comprehensive set of rules without the benefit of legislative guidance," or whether it simply "fill[ed] in the details of broad legislation describing the over-all policies to be implemented" (Boreali, 71 NY2d at 13).  In Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene, for instance, we invalidated the "Sugary Drinks Portion Cap Rule" adopted by the New York City Board of Health, which restricted food service establishments from selling large sugary drinks (23 NY3d at 690).  There, the Board's enabling legislation contained a general, overarching mandate concerning the promotion of public health, but neither the legislature nor the City Council had ever promulgated a statute -- or otherwise defined a policy -- concerning excessive soda consumption (id. at 699-700).  We therefore held that the Portion Cap Rule -- a targeted and specific policy aimed at combating obesity -- amounted to a "new policy choice" founded on inadequate legislative guidance (id. at 700).

Here, by contrast, in enacting VTL §§ 1192-1193, the legislature created a statutory scheme aimed at addressing the problem of drunk driving and, more specifically, the problem of recidivist drunk drivers.  Beyond criminalizing drunk driving (VTL § 1192), the legislature also established licensing

implications -- including "minimum" revocation periods -- associated with certain drunk driving offenses (VTL § 1193 [2]). With regard to reissuance following "the expiration of the minimum [revocation] period," the VTL contains an express delegation to the discretion of the Commissioner (VTL § 1193 [2] [c]).  Taken together, these provisions evince a clear legislative policy decision to restrict the driving privileges of recidivist drunk drivers, and to entrust relicensing determinations to the sound discretion of the Commissioner.  By establishing rules to guide the Commissioner's discretion, the Regulations fall squarely within the confines of this statutory mandate and fill in the details of the Vehicle and Traffic Law in the manner contemplated by the legislature.

## C.

Pursuant to the third Boreali factor, we assess "whether the legislature has unsuccessfully tried to reach agreement on the issue, which would indicate that the matter is a policy consideration for the elected body to resolve" (Greater N.Y. Taxi Assn., 25 NY3d at 612-613).  Petitioners first argue that the legislature routinely fails to pass proposed "get tough on DWI" laws, proving that recidivist drunk driving implicates a difficult social problem best resolved by elected representatives.  Petitioners point to a number of failed bills aimed at addressing drunk driving, including at least three that would have affected post-revocation relicensing.  Petitioners

also claim that the legislature frequently revisits and refines New York's drunk driving laws, signaling an intention to dominate the field to the exclusion of DMV.

Even accepting petitioners' claim that the legislature has repeatedly tried to reach agreement in this field, the dearth of successful legislation affords limited probative value in our analysis.  As we have repeatedly noted, "[l]egislative inaction, because of its inherent ambiguity, affords the most dubious foundation for drawing positive inferences" (Matter of Oswald N., 87 NY2d 98, 103 n 1 [1995], quoting Clark v Cuomo, 66 NY2d 185, 190-191 [1985] [citations omitted]).  Nor does "the mere fact that the Legislature has enacted specific legislation in a particular field" necessarily indicate that "broader agency regulation of the same field is foreclosed" (Matter of Consolidated Edison Co. of N.Y. v Department of Envtl. Conservation, 71 NY2d 186, 193 [1988]).

Notably, DMV has been regulating in the realm of post-revocation relicensing since 1980.  In the ensuing decades, the legislature -- though fully capable of corrective action -- has done nothing to curb the Commissioner's authority or otherwise signal disapproval.  To the contrary, the legislature has, for nearly forty years, left the Commissioner's authority intact, demonstrating the legislature's ongoing reliance on DMV's expertise.  Given the absence of any legislative interference over this extended time period, "we can infer, to some degree,

that the legislature approves" of the Commissioner's actions

(<u>Greater N.Y. Taxi Assn.</u>, 25 NY3d at 612).

<u>D.</u>

The fourth and final <u>Boreali</u> factor concerns whether any "special expertise or technical competence" was involved in the development of the challenged Regulations (<u>Boreali</u>, 71 NY2d at 14).  Both highway safety (VTL § 210 [1]) and licensing administration (VTL § 508 [4]) fall squarely within the province of the Commissioner.  The Commissioner is also specifically tasked, pursuant to the VTL, with "collect[ing] and analyz[ing] statistical information and data" pertaining to drunk driving (VTL § 216-a).  The data collected by the Commissioner -- as well as other independent studies -- substantiates DMV's contention that a relatively small number of recidivist drunk drivers are responsible for a disproportionate number of accidents.

Invoking its expertise, the Commissioner tightened relicensing requirements in order to target these high-risk, recidivist offenders.  By categorizing drunk driving offenders based on a review of their driving history, the Regulations ensure consistent treatment of relicensing applicants in a manner commensurate with the risk that they pose to the public.  And by implementing relicensing guidelines aimed at promoting highway safety, the Regulations operate squarely within DMV's area of expertise.

On balance, the <u>Boreali</u> factors overwhelmingly weigh in

favor of DMV.  Though the line between administrative rule-making and legislative policy-making may be "difficult to define" (Boreali, 71 NY2d at 11), here, the Regulations fall squarely within the bounds of valid administrative action.  The legislature delegated clear authority to the Commissioner over post-revocation relicensing applications and, in enacting the Regulations, the Commissioner acted squarely within the confines of that authority.  Boreali is not "an escape hatch for those" -- like petitioners -- "who are unhappy with a regulation" (Matter of New York Statewide Coalition of Hispanic Chambers of Commerce, 23 NY3d at 718 [Read, J., dissenting]).  Accordingly, we hold that the Regulations were a valid exercise of the Commissioner's rulemaking authority, consistent with the separation of powers doctrine.  We reject petitioners' claim to the contrary.

## Rationality

Petitioners next contend that the Regulations are arbitrary and capricious, and therefore cannot withstand rational basis scrutiny.  Petitioners' rationality challenge focuses on the meaning of "[s]erious driving offense" (15 NYCRR 136.5 [a] [2]) and "alcohol- or drug-related driving conviction or incident" (15 NYCRR 136.5 [a] [1]), as defined by the Regulations.

"The standard for judicial review of an administrative regulation is whether the regulation has a rational basis and is not unreasonable, arbitrary or capricious" (Matter of Consolation

Nursing Home v Commissioner of N.Y. State Dept. of Health, 85 NY2d 326, 331 [1995]).  To meet this "limiting" standard, petitioners must show that the Regulations are "so lacking in reason" that they are "essentially arbitrary" (Kuppersmith v Dowling, 93 NY2d 90, 96 [1999]).

Petitioners fail to meet this heavy burden.

### A.

Petitioner Matsen argues that the definition of "serious driving offense" (15 NYCRR 136.5 [a] [2]) is both overinclusive and underinclusive, and creates an unreasonable outcome for an applicant who -- like Matsen -- "has three or four alcohol- or drug-related convictions or incidents" and "one or more serious driving offenses" within the 25 year look back period (15 NYCRR 136.5 [b] [2]).  Petitioner Matsen first claims that the definition is overly broad, noting that her "serious driving offense" -- two six-point speeding violations -- is treated more seriously under the Regulations than a fourth drunk driving offense, triggering a lifetime ban on relicensing rather than a five-year waiting period (compare 15 NYCRR 136.5 [b] [2] with 15 NYCRR [b] [3]).  Similarly, petitioners Carney and Matsen complain that the Regulations are irrational to the extent that applicants with five or more drunk driving offenses -- like Carney -- are treated the same as applicants with three or four drunk driving offenses and a "serious driving offense" -- like Matsen (compare 15 NYCRR 136.5 [b] [1] with 15 NYCRR [b] [2]).

Lastly, petitioner Matsen contends that the definition of "serious driving offense" is too narrow, and therefore arbitrary and capricious, because it excludes certain offenses, such as first-degree aggravated unlicensed operation of a motor vehicle (VTL § 511 [3]) and fleeing the scene of an accident resulting in serious physical injury (VTL § 600 [2]).

In formulating the Regulations, DMV "deliberated extensively about how to restrict the driving privileges of persons who are eligible for relicensure but who might continue to present highway safety concerns" (NY Reg, March 13, 2013, at 46). Among other things, DMV considered its own collection of empirical data, including statistics pertaining to drunk driving offenders and other high-risk relicensing applicants (VTL § 216-a). The inclusion of the "serious driving offense" provision in the Regulations amounts to a line-drawing determination by the Commissioner regarding the degree of danger posed by various traffic offenses that do not involve drunk driving -- a value judgment warranting substantial deference. We decline to disturb the Commissioner's informed and reasonable determination, made pursuant to an express delegation of authority and falling well within DMV's unique area of expertise (see Matter of Consolation Nursing Home, 85 NY2d at 331).

## B.

Petitioners Acevedo and Carney next challenge the Regulations' definition of "alcohol- or drug-related driving

conviction or incident" (15 NYCRR 136.5 [a] [1]).[3]  In particular, petitioners contend that the definition is underinclusive, and therefore irrational, because it fails to include certain youthful offender violations and felony convictions that are drunk driving-related.

Contrary to petitioners' claim, the definition of "alcohol- or drug-related conviction of incident" is not "so lacking in reason" that it is "essentially arbitrary" (Kuppersmith, 93 NY2d at 96 [1999]).  The exclusion of youthful offender violations, for instance, reflects a reasonable determination by the Commissioner that, unlike other drunk driving offenders, a youthful offender's conduct -- although serious -- may be largely attributable to the offender's age and immaturity at the time of the incident (see People v Drayton, 39 NY2d 580, 584 [1976]).  Similarly, the Commissioner's exclusion of certain felony convictions, such as first-degree aggravated unlicensed operation of a motor vehicle (VTL § 511 [3]), reasonably recognizes that such convictions do not necessarily involve drunk driving and therefore do not warrant treatment as an "alcohol- or drug-related conviction of incident" under the Regulations.

Because the Regulations have a sound and reasonable basis, petitioners' rationality challenge must be rejected.

---

[3] This contention is unpreserved with respect to petitioner Matsen.

Retroactivity & Ex Post Facto

Lastly, petitioners argue that the denial of their relicensing applications constitutes an impermissible retroactive application of the Regulations and a violation of the Ex Post Facto Clause of the United States Constitution (US Const, art 1, § 10, cl 1). Petitioners' retroactivity arguments are unavailing.

While New York law does not favor retroactive operation, the Regulations were not impermissibly applied retroactively to petitioners' applications simply because the Commissioner considered prior conduct -- namely, petitioners' drunk driving offenses -- that predated the Regulations. As we have previously noted, regulations are not retroactive "when made to apply to future transactions merely because such transactions . . . are founded upon antecedent events" (Forti v New York State Ethics Commn, 75 NY2d 596, 609-610 [1990] [internal quotation marks and citation omitted]). Here, the Regulations did not rescind petitioners' existing licenses on the basis of prior conduct. Rather, the Regulations applied only to the Commissioner's prospective consideration of petitioners' pending relicensing applications -- a "future transaction[]" (id. at 609). The Commissioner's consideration of "antecedent events" -- petitioners' driving records -- does not, by itself, render the Regulations "retroactive" in nature (Matter of St. Clair Nation v City of New York, 14 NY3d 452, 456-458 [2010] [internal quotation

marks and citation omitted]).

For the same reason, we reject petitioners' contention that the Regulations, as applied to their applications, constitute a violation of the Ex Post Facto Clause of the United States Constitution (Forti, 75 NY2d at 610 n 4; Matter of St. Clair Nation, 14 NY3d at 458 n 3).  In any event, "[t]he prohibition on ex post facto laws" is inapplicable, as it "applies only to penal statutes" (Kellogg v Travis, 100 NY2d 407, 410 [2003]).  The "revocation of the privilege of operating a motor vehicle" -- and by extension, the denial of the privilege of relicensing -- is "essentially civil in nature," as it serves primarily to "protect[] . . . the public from such a dangerous individual" (Matter of Barnes v Tofany, 27 NY2d 74 [1970]).  Because they "do[] not seek to impose a *punishment*," the Regulations "do[] not run afoul of the Ex Post Facto Clause" (Kellogg, 100 NY2d at 410 [emphasis in original]).

We therefore reject petitioners' argument that the Commissioner's consideration of conduct that occurred before the promulgation of the Regulations constituted retroactive application.

IV.

The lower courts properly upheld the Regulations -- and their application to petitioners' relicensing applications -- as a valid exercise of the Commissioner's delegated authority. Accordingly, in Matter of Acevedo and Matter of Carney, the order

of the Appellate Division should be affirmed, without costs; and

in <u>Matter of Matsen</u>, the order of the Appellate Division should

be affirmed, without costs, and certified question not answered

as unnecessary.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

<u>For Case No. 40 and Case No. 41</u>:  Order affirmed, without costs.
Opinion by Judge Garcia.  Chief Judge DiFiore and Judges Rivera,
Fahey and Wilson concur.  Judge Stein took no part.

<u>For Case No. 42</u>:  Order affirmed, without costs, and certified
question not answered as unnecessary.  Opinion by Judge Garcia.
Chief Judge DiFiore and Judges Rivera, Fahey and Wilson concur.
Judge Stein took no part.


Decided May 9, 2017