Matter of Dry Harbor Nursing Home v Zucker (2019 NY Slip Op 06034)





Matter of Dry Harbor Nursing Home v Zucker


2019 NY Slip Op 06034


Decided on August 1, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: August 1, 2019

527328

[*1]In the Matter of DRY HARBOR NURSING HOME et al., Appellants,
v
HOWARD ZUCKER, as Commissioner of Health, et al., Respondents.

Calendar Date: June 5, 2019

Before: Lynch, J.P., Clark, Mulvey, Aarons and Rumsey, JJ.


Harter Secrest & Emery LLP, Rochester (F. Paul Greene of counsel), for appellants.
Letitia James, Attorney General, Albany (Kathleen M. Treasure of counsel), for respondents.



MEMORANDUM AND ORDER
Rumsey, J.
Appeals (1) from that part of an order and judgment of the Supreme Court (McNally Jr., J.), entered December 1, 2017 in Albany County, which, in a combined proceeding pursuant to CPLR article 78 and action for declaratory judgment, (a) partially dismissed petitioners' application to invalidate an emergency regulation promulgated by the Department of Health regarding the Nursing Home Quality Pool, and (b) partially granted respondents' motion for summary judgment dismissing the petition/complaint, and (2) from an order of said court, entered July 26, 2018 in Albany County, which denied petitioners' motion to renew and amend the caption and, upon reargument, adhered to its prior decision dismissing the petition/complaint.
These appeals involve challenges to a program of the Department of Health (hereinafter DOH) known as the Nursing Home Quality Pool (hereinafter the Quality Pool). The Quality Pool is a $50 million budget-neutral pool that was established in the 2010-2011 final state budget to improve the quality of care for residents housed in non-specialty, Medicaid-certified nursing home facilities in New York by making quality incentive payments to facilities that meet certain criteria. The Quality Pool is funded by reducing Medicaid reimbursements to all eligible facilities by $50 million annually, which is then redistributed based on the quality of care provided to patients. Petitioners — 150 nursing homes that operate in New York and participate in the state Medicaid program — commenced this combined CPLR article 78 proceeding and declaratory judgment action seeking to invalidate the Quality Pool program. After commencement, DOH promulgated an emergency regulation to implement the program. It provided for ranking of eligible facilities into five quintiles based on the quality of care that each provided as measured by 18 factors and for distribution of the entire Quality Pool to nursing [*2]home facilities in the top three quintiles [FN1]. Petitioners thereafter filed a second amended petition/complaint seeking, among other things, a declaration that the emergency regulation is null and void and an order permanently enjoining respondents from taking any action pursuant thereto. By order and judgment entered in December 2017, Supreme Court partially granted the petition/complaint by invalidating the emergency regulation based on DOH's failure to comply with certain requirements of the State Administrative Procedure Act. However, the court granted respondents' motion for summary judgment to the extent of dismissing petitioners' remaining claims.
After Supreme Court's order and judgment in this matter, DOH promulgated a permanent regulation related to the implementation of the Quality Pool, effective January 3, 2018 (see 10 NYCRR 86-2.42). Petitioners thereafter moved for, among other things, leave to renew and reargue. In a July 2018 order, the court granted reargument, adhered to its prior decision and denied leave to renew. Petitioners appeal from the order and judgment partially dismissing their petition and the July 2018 order.
We agree with petitioners that the promulgation of the permanent regulation did not render the controversy over the validity of the Quality Pool under the emergency regulation moot. "The adoption of a new law does not moot a challenge to the validity of an older law, even when the older law has been superseded, when both laws suffer from the same alleged infirmities such that a challenge to the new law will be affected by the resolution of the claims regarding the older law" (Matter of New York State Corr. Officers and Police Benevolent Assn., Inc. v New York State Office of Mental Health, 138 AD3d 1205, 1207 [2016] [citations omitted]; see generally Saratoga County Chamber of Commerce v Pataki, 100 NY2d 801, 812 [2003], cert denied 540 US 1017 [2003]; Matter of Johnson v Pataki, 91 NY2d 214, 222 [1997]). Here, the permanent regulation superseded the emergency regulation and, thus, now governs the implementation of the Quality Pool. Although the permanent regulation removes many details contained in the emergency regulation, it did not meaningfully change the function of the Quality Pool nor "adversely affect or change the basis of petitioners' challenge to the [Quality Pool]" on appeal (Matter of Spence v Shah, 136 AD3d 1242, 1244 [2016], lv denied 27 NY3d 908 [2016]; see 10 NYCRR 86-2.42). As the nursing home facilities that are currently subject to the Quality Pool will be affected if petitioners are successful in challenging the Quality Pool under the emergency regulation, we conclude that the matter is not moot (see generally Matter of Hearst Corp. v Clyne, 50 NY2d 707, 714 [1980]).
Next, we consider petitioners' contention that the Quality Pool was never authorized by the Legislature and that, in the event that it was authorized, it constitutes an unlawful delegation of legislative authority. "The issues of delegation of power and separation of powers overlap and are often considered together. This makes sense because, if an agency was not delegated the authority to enact certain rules, then it would usurp the authority of the legislative branch by enacting those rules. The constitutional principle of separation of powers requires that the [L]egislature make the critical policy decisions, while the executive branch's responsibility is to implement those policies. The branches of government cannot always be neatly divided, however, and common sense must be applied when reviewing a separation of powers challenge. As long as the [L]egislature makes the basic policy choices, the legislation need not be detailed or precise as to the agency's role" (Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn., 25 NY3d 600, 608-609 [2015] [internal quotation marks, ellipsis and citations omitted]).
Here, the Legislature made the basic policy choice of authorizing creation and implementation of the Quality Pool. The statute that was in effect when the emergency regulation was promulgated specifically authorized creation of a quality pool program based on rate adjustments and contemplated that certain facilities would be ineligible to receive payments (see Public Health Law § 2808 [2-c] [d]). Thus, we must then determine whether DOH "crossed the hazy line between administrative rule-making and legislative policy-making" when it promulgated the emergency regulation implementing the Quality Pool program (Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn., 25 NY3d at 610 [internal quotation marks and citation omitted]). In making our determination, we must consider the following four factors first enunciated in Boreali v Axelrod (71 NY2d 1, 12-14 [1987]): "whether the agency: (1) operated outside of its proper sphere of authority by balancing competing social concerns in reliance solely on its own ideas of sound public policy; (2) engaged in typical, interstitial rulemaking or wrote on a clean slate, creating its own comprehensive set of rules without the benefit of legislative guidance; (3) acted in an area in which the Legislature has repeatedly tried — and failed — to reach agreement in the face of substantial public debate and vigorous lobbying by a variety of interested factions; and (4) applied its special expertise or technical competence to develop the challenged regulations" (Matter of Spence v Shah, 136 AD3d at 1245 [internal quotation marks and citations omitted]). "The Boreali factors 'are not mandatory, need not be weighed evenly, and are essentially guidelines for conducting an analysis of an agency's exercise of power'" (Matter of LeadingAge N.Y., Inc. v Shah, 153 AD3d 10, 18 [2017], affd 32 NY3d 249 [2018], quoting Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn., 25 NY3d at 612).
DOH is charged with the responsibility of administering the state Medicaid program and, thus, "has inherent authority to protect the quality and value of services rendered" (Matter of LeadingAge N.Y., Inc. v Shah, 32 NY3d 249, 262 [2018] [internal quotation marks and citations omitted]; see Social Services Law § 363-a). The Legislature has also vested DOH with broad authority to promulgate regulations "for rate adjustments or payment enhancements to facilitate a minimum four-year transition of facilities to the rate-setting methodology . . . [and] for facilitating quality improvements in residential health care facilities . . . through the establishment of a nursing home quality pool" (Public Health Law § 2808 [2-c] [d]). In establishing the Quality Pool, this enabling legislation carves out an exception for nursing home facilities that are "deemed ineligible for quality pool payments due exclusively to a specific case of employee misconduct" (Public Health Law § 2808 [2-c] [d]). The foregoing demonstrates that the Legislature delegated to DOH the authority to establish the Quality Pool as a means of facilitating improvements in nursing home care. Furthermore, DOH's implementation of the Quality Pool does not violate the separation of powers doctrine. In developing the Quality Pool, DOH consulted with the nursing home industry and nursing home patient advocates as required by the enabling legislation (see Public Health Law § 2808 [2-c] [d]), acted pursuant to the Legislature's policy decision to improve the quality of nursing homes through a quality pool, filled in the details of that policy in the manner contemplated by the Legislature and applied its special expertise in Medicaid administration and the nursing home industry. Therefore, upon consideration of the relevant Boreali factors, we are not persuaded that DOH engaged in legislative policy-making (see Matter of Acevedo v New York State Dept. of Motor Vehs., 29 NY3d 202, 222-226 [2017]; Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation and Historic Preserv., 27 NY3d 174, 181-183 [2016]; Matter of Spence v Shah, 136 AD3d at 1245-1246).
The Quality Pool is not funded by an improper tax. "A tax is a charge that a government exacts from a citizen to defray the general costs of government unrelated to any particular benefit received by that citizen" (Matter of Walton v New York State Dept. of Correctional Servs., 13 NY3d 475, 485 [2009] [citation omitted]; accord New York Ins. Assn., Inc. v State of New York, 145 AD3d 80, 90 [2016], lv denied 29 NY3d 910 [2017]). In contrast, "a fee is a charge, imposed upon certain citizens or entities who use particular services of or obtain benefits from a particular governmental program or agency, to defray the costs of those services or benefits" (Matter of Homestead Funding Corp. v State of N.Y. Banking Dept., 95 AD3d 1410, 1410-1411 [2012]; see Matter of Walton v New York State Dept. of Correctional [*3]Servs., 13 NY3d at 485; New York Ins. Assn., Inc. v State of New York, 145 AD3d at 91). The funds collected from the nursing homes that are subject to the Quality Pool constitute a rate adjustment or a fee, not a tax, because the purpose of collecting and redistributing funds is to incentivize nursing homes to provide high quality care, "not to raise revenue for the support of the government generally" (Matter of Homestead Funding Corp. v State of N.Y. Banking Dept., 95 AD3d at 1411 [internal quotation marks and citation omitted]; see Matter of Prometheus Realty Corp. v New York City Water Bd., 30 NY3d 639, 647 [2017]; Matter of Walton v New York State Dept. of Correctional Servs., 13 NY3d at 485-549).
We reject petitioners' claim that the Quality Pool is improperly retroactive. "Generally, a regulation should not be applied retroactively unless such a result is clearly intended" (Matter of Buffalo Teachers Fedn., Inc. v Elia, 162 AD3d 1169, 1176 [2018] [citation omitted], lv denied 32 NY3d 915 [2019]). Public Health Law § 2808 (2-c) (d) was amended in 2014 to create an exception for nursing home facilities that are "deemed ineligible for quality pool payments due exclusively to a specific case of employee misconduct" and to indicate that "[r]egulations pertaining to the facilitation of quality improvement may be made effective for periods on and after [January 1, 2013]." This statutory provision demonstrates that retroactive application of the Quality Pool is "clearly intended" (Matter of Buffalo Teachers Fedn., Inc. v Elia, 162 AD3d at 1176; compare Matter of Zajdowicz v New York State & Local Police & Fire Retirement Sys., 267 AD2d 863, 865 [1999]). Further, as petitioners do not have a "cognizable . . . vested property interest" in receiving Medicaid reimbursement for rates that are not yet final (Matter of Raynor v Landmark Chrysler, 18 NY3d 48, 59 [2011] [internal quotation marks and citation omitted]; see Matter of Concerned Home Care Providers, Inc. v State of New York, 108 AD3d 151, 157 [2013], lv dismissed 22 NY3d 946 [2013]; Matter of Astor Gardens Health Care Ctr. v Novello, 304 AD2d 961, 964 [2003]; compare Matter of Visiting Nurse Serv. of N.Y. Home Care v New York State Dept. of Health, 13 AD3d 745, 747 [2004], affd 5 NY3d 499 [2005]), the retroactive application of the Quality Pool is not improper.
Petitioners' remaining contention has been examined and found to be without merit.
Lynch, J.P., Clark, Mulvey and Aarons, JJ., concur.
ORDERED that the order and judgment and the order are affirmed, without costs.



Footnotes

Footnote 1: Nursing home facilities in the first quintile were to receive approximately one half of the entire Quality Pool, with each receiving approximately three times as much it contributed to the Quality Pool. Nursing home facilities in the second quintile were to each receive payments from the Quality Pool of approximately twice the amount contributed and nursing home facilities in the third quintile were to receive Quality Pool payments approximately equal to the amount contributed. Nursing home facilities in the lowest two quintiles were ineligible to receive any payments from the Quality Pool.