# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 70
In the Matter of Terrence Stevens
et al.,
     Respondents,
    v.
New York State Division of
Criminal Justice Services, et
al.,
     Appellants.

Matthew W. Grieco, for appellants.
Doran J. Satanove, for respondents.
District Attorneys Association of the State of New York, Inc.; Alexander F. Roehrkasse; Parents of Murdered Children, Inc.; New York Civil Liberties Union; Brendan Parent; Erin E. Murphy, amici curiae.

WILSON, Chief Judge:

The issue before us is whether the legislature's grant of rulemaking authority to the Commission on Forensic Sciences was sufficient to authorize the Commission's promulgation of the Familial DNA Search Regulations, codified at 9 NYCRR 6192.1 and 6192.3. We hold that it was.

- 1 -

I.

In 1994, cognizant of the promises and perils of the emerging use of DNA technology in law enforcement, the legislature took a measured but significant step by enacting the DNA Databank Act (L 1994, ch 737 [codified at Executive Law § 995 *et seq.*] [Databank Act]).

The Databank Act served a dual purpose; it authorized the creation of the New York State Commission on Forensic Science (Commission) (Executive Law § 995-a [1]) and the DNA Subcommittee (§ 995-b [13]), as well as the establishment of the DNA Identification Index (DNA Databank or Databank) (subd [6]).  The DNA Databank is a statewide "DNA identification record system" (*id.*), containing DNA collected from "designated offenders," individuals who are required to provide DNA samples after being convicted of certain statutorily enumerated crimes (subd [7]).

The Commission and DNA Subcommittee are independent oversight agencies with different functions.  The DNA Subcommittee, composed solely of scientists, is granted certain responsibilities, among them: the "sole authority to grant, deny, review or modify a DNA forensic laboratory accreditation" (subd [2-a]).  The Commission, composed mostly of nonscientists, is charged with "promulgat[ing] a policy for the establishment and operation of a DNA identification index consistent with the operational requirements and capabilities of the division of criminal justice services [DCJS]" (subd [9]), including the methodologies used in compiling the index; safeguards for accuracy and security; the promulgation of written agreements specifying the terms of access, use and prohibitions against redisclosure of any information obtained from the Databank; the designation of one

or more approved methodologies for the performance of DNA testing; and the promulgation of standards for determination of a match between DNA records in the Databank and DNA records submitted for comparison therewith (*see* § 995-b).

The Databank Act provides strict guidelines on the approved uses of Databank information (*see* § 995-c [6] [enumerating exhaustive purposes for which genetic and identifying information may be released]), and authorizes the Commission to develop and promulgate regulations concerning the release of genetic and identifying information stored in the Databank in compliance with those guidelines (§ 995-b [9] [directing the Commission to develop and promulgate policy concerning the release and disclosure Databank information]), including when to release the identity of a "match" (§ 995-c [6] [a] [authorizing the release of Databank information to law enforcement agencies and district attorneys' offices "for law enforcement identification purposes upon submission of a DNA record in connection with the investigation of one or more crimes"]).

After the Databank Act was adopted, the Commission created an implementation plan and promulgated a set of regulations governing the use of the Databank (9 NYCRR 6192.2), including the definition of a genetic match (§ 6192.1), policies limiting the disclosure of genetic and identifying information contained in the Databank (§§ 6192.5-6192.9), and policies authorizing the release of identifying information to law enforcement (§ 6192.3 [b]-[c], [f]-[g]).

The Commission's initial regulations permitted the New York State Division of Criminal Justice Services (DCJS) to release information contained within the Databank to law enforcement when a databank search yielded a "direct match," i.e., when the alleles in

the core loci of a DNA sample recovered from a crime scene are the same as those in a DNA sample contained in the Databank (*see* Partial Match Policy for the DNA Databank, 32 NY Reg 2, 5 [July 21, 2010] [Partial Match Policy] ["Currently, when a crime scene DNA sample is submitted to a New York State forensic laboratory, laboratory officials report only if the sample matches a *particular individual* in the state's DNA databank"]); direct matches strongly indicate that the two samples are likely from the same individual (*see id.*; Federal Bureau of Investigation, *Frequently Asked Questions on CODIS and NDIS* ¶ 2, available at https://www.fbi.gov/how-we-can-help-you/dna-fingerprint-act-of-2005-expungement-policy/codis-and-ndis-fact-sheet [last accessed Sept. 22, 2023]).

"Partial matches," on the other hand, are "near hit[s]" (Partial Match Policy at 5): matches in which alleles at the core loci in two DNA samples (one retrieved from the Databank, and one retrieved from a crime scene) are not the same but share a high number of matching alleles. Such "near hit[s] [may] greatly limit the pool of potential suspects" (*id.*), though they can indicate many things. A near hit might suggest that the person in the Databank is a "close blood relative" of the person whose DNA sample was found at the crime scene (*id.*), but it might also indicate that the sample found at the crime scene was partially degraded or contained a mixture of multiple people's DNA (*see* brief for petitioners-respondents at 12, citing 9 NYCRR 6192.3 [c] [enumerating "sufficient scientific reasons" to allow for partial match searches, including "the apparent presence of mixtures, sample degradation or limited sample availability"]).

After four years of deliberation, in 2010 the Commission promulgated a partial match rule which, subject to certain restrictions, authorized the release of partial match

information to law enforcement (Partial Match Policy at 5). The 2010 partial match regulations did not permit familial DNA searches (*see id.* ["The new regulations will not permit what is often called 'familial searching,' or singling out particular families and actively searching their DNA profiles"]). A familial DNA search is essentially an intentional search for partial matches, as opposed to the unintentional partial match system previously created (*see* NY St Div of Criminal Justice Servs Mem from Gina L. Bianchi, Deputy Commr & Counsel, to Members of the Commn on Forensic Science, dated Jan. 2, 2008 at 1-2).

To conduct a familial search, the DCJS and the State Combined DNA Index System (CODIS) laboratory use the Denver Familial Search Software, a specialized computer program, to look for a close partial match between sampled DNA gathered from a crime scene, and DNA profiles in the Databank (respondent-appellant's brief at 17). The search "generates a list of candidates based on kinship statistics to indicate potential biologically related individuals" (39 NY Reg 8, 9 [July 26, 2017] [FDS Policy]). The Commission determined an "established kinship threshold value[s]" for familial searches, meaning how closely related the individuals must be to return a family match to report to law enforcement (*see* 9 NYCRR 6192.3 [j] [2]).

In 2017, the DNA Subcommittee submitted to the Commission a recommendation to authorize familial DNA searches (FDS Policy at 9). The recommendation authorized familial DNA searches, subject to stringent restrictions regarding when such searches were to be permitted and practices on how law enforcement may request them. The Commission adopted the DNA Subcommittee's recommendation (*id.* at 8). After a period of notice and

comment, on October 18, 2017, the DCJS formally adopted the recommendation as part of

formal Familial DNA Search (FDS) Regulations (codified at 9 NYCRR 6192.1, 6192.3).[1]

Under the FDS Regulations, law enforcement officers wishing to conduct a familial

search must first determine that, for a DNA sample collected at a crime scene, "there is not

a match or a partial match to a[n] [existing] sample in the DNA databank" (§ 6192.3 [h]).

Law enforcement may not request a familial search unless the crime under investigation is

one of a statutorily enumerated list of crimes or presents "a significant public safety threat"

(subd [h] [1] [iv]).  The agency must also demonstrate that before requesting a familial

DNA search, they have conducted "reasonable investigative efforts," or else that exigent

circumstances exist (para [2] [i]).  Before the results of a search are released, the requesting

agency must comply with several conditions, including confirming in writing that the

information is sought "for investigatory law enforcement purposes only" and will be

"treated only as an investigative lead" and completing mandatory training regarding the

---

[1] The twelve states that explicitly allow familial DNA searching account for 49.2% of the population of the United States (*see* Appx 427; https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-total.html).  One report found that, as of 2017, 11 states—including the three most populous (California, Texas, and Florida)—used familial DNA searching (*see* Michael B. Field & Sara Debus-Sherill, *Study of Familial DNA Searching Policies and Practices* [June 2017]).  Other states besides New York have since used or authorized FDS (*see e.g.* Mont Code Ann § 44-6-104 [2] [2021 legislation allowing FDS if a court issues a search warrant based on probable cause]; *State v Mitcham*, — P3d —, 2023 WL 5354942, *1, 2023 Ariz App LEXIS 360, *3 [Aug. 22, 2023, No. 1 CA-CR 23-0014] [noting FDS use by Arizona law enforcement]).  Only Maryland and the District of Columbia expressly ban its use (MD Code Ann, Pub Safety § 2-506 [d]; DC Code Ann § 22-4151 [b]).

limitations of familial search, "guidance on how to best evaluate leads," and the confidentiality requirements (*id.* § 6192.3 [k]).

There is no provision in the FDS for an identified relative to be notified and/or challenge the search before law enforcement officials may proceed with an investigation based on a familial match from the Databank. Petitioners Terrence Stevens and Benjamin Joseph are two Black men living New York who have never been convicted of a crime. Each has a brother whose genetic information has been collected and stored in the DNA Databank as the result of a felony conviction, in accordance with Databank Act requirements. Mr. Stephens and Mr. Joseph brought this CLPR article 78 proceeding against respondents the DCJS, the Commission, DCJS Executive Deputy Commissioner and Commission Chairman Michael C. Green, and the DNA Subcommittee alleging, among other claims, that respondents lacked statutory authority to promulgate the FDS Regulations and therefore violated the separation of powers doctrine under the New York Constitution. Respondents denied petitioners' allegations and asserted that petitioners lacked standing to challenge the FDS Regulations.

Supreme Court held that petitioners had standing to bring their article 78 petition, but denied the petition on the merits, determining that it was a proper exercise of the Commission's statutory authority to promulgate the FDS Regulations (*see* 2020 NY Slip Op 30861[U], *1 [Sup Ct, NY County 2020]). The Appellate Division, with two Justices dissenting on standing, reversed Supreme Court's judgment, granted the petition, and annulled the FDS Regulations (206 AD3d 88 [1st Dept 2022]).

Respondents appealed as of right (*see* CPLR 5601 [a]), and we now reverse the Appellate Division's order and hold that the Commission had the statutory authority to promulgate the FDS Regulations.

II.

A petitioner challenging government agency action pursuant to an article 78 petition has the burden of demonstrating an "injury in fact" and that the alleged injury falls within the "zone of interests or concerns sought to be promoted or protected by the statutory provision under which the [government] has acted" in order to have standing to challenge that action (*Matter of Mental Hygiene Legal Servs. v Daniels*, 33 NY3d 44, 50 [2019], quoting *New York State Assn. of Nurse Anesthetists v Novello*, 2 NY3d 207, 211 [2004]; *see also Matter of Dairylea Coop. v Walkley*, 38 NY2d 6, 9 [1976]).  "The injury-in-fact requirement necessitates a showing that the party has an actual legal stake in the matter being adjudicated and has suffered a cognizable harm that is not tenuous, ephemeral, or conjectural but is sufficiently concrete and particularized to warrant judicial intervention" (*Daniels*, 33 NY3d at 50 [internal quotation marks and citation omitted]; *see also Matter of Association for a Better Long Is., Inc. v New York State Dept. of Envtl. Conservation*, 23 NY3d 1, 7 [2014]).  While "[t]he requirement of injury in fact for standing purposes is closely aligned with our policy not to render advisory opinions" (*Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761, 761 [1991]), we have also cautioned that standing rules should not be applied "in an overly restrictive manner where the result would be to completely shield a particular action from judicial review" (*Matter of Sierra Club v Village*

*of Painted Post*, 26 NY3d 301, 311 [2015], quoting *Matter of Association for a Better Long Is., Inc.*, 23 NY3d at 6).

Although the injury in fact here is unusual, it is cognizable. Because each petitioner has a brother whose DNA is stored in the Databank, he has a unique risk of being identified through the Databank and targeted for police scrutiny because of his familial relationship and shared genetic material (*Society of Plastics Indus.*, 77 NY2d at 774). Under these particular circumstances, that risk is not "founded on [impermissible] layers of speculation" (*Novello*, 2 NY3d at 213).

Similarly, petitioners have demonstrated that their injury falls "within the concerns the Legislature sought to advance or protect by the statute" (*Society of Plastics Indus.*, 77 NY2d at 774 [zone of interests requirement "assures that groups whose interests are only marginally related to, or even inconsistent with, the purposes of the statute cannot use the courts to further their own purposes at the expense of the statutory purposes"]). By limiting the number of individuals whose DNA could be maintained in the Database, the legislature demonstrated an intent to concomitantly limit the number of individuals whose information could be obtained from the Databank.[2] Our standing rules "help courts separate the tangible from the abstract or speculative injury, and the genuinely aggrieved from the

---

[2] Here, the Databank Act seeks to protect the privacy interests implicated by use of the information in the Databank (*see* Executive Law §§ 995-b [9] [b] [ii]-[vi], [viii]-[ix] [enumerating Committee's duties to implement safeguards protecting the confidentiality of genetic information stored in the Databank]; 995-d [detailing confidentiality requirements to protect Databank information], 995-f [providing criminal penalties for unauthorized use or disclosure of information stored in the Databank]).

judicial dilettante or amorphous claimant" (*Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801, 812 [2003]).  Here, petitioners have identified a genuine injury.

## III.

On the merits, this appeal presents two straightforward questions: (A) does the legislature have the power to delegate rulemaking authority over familial DNA searches to the Commission; and (B) did the legislature do so?  The Court unanimously agrees that the legislature has that power; the disagreement is whether the Databank Act granted the Commission the authority to promulgate the FDS Regulations.  We hold that it did so.  Although the Appellate Division examined the factors laid out in *Boreali v Axelrod*, (71 NY2d 1 [1987]), that case has no application here.[3]  Interpretation of the Databank Act to determine whether the regulations fall within the scope of the statute's grant of regulatory authority is a pure question of statutory interpretation.

## A

New York Constitution, article V, § 3 expressly provides that "the legislature may from time to time assign by law new powers and functions to . . . commissions."  Although "the Legislature cannot pass on its law-making functions to other bodies" (*Matter of Levine*

---

[3] *Boreali* concerned the exceedingly broad and nonspecific grant contained in section 225 (5) (a) of the Public Health Law, which authorized the Public Health Committee to "deal with any matters affecting . . . the public health."  The Court's concern was that such a "facially broad . . . legislative grant of authority must be construed, whenever possible, so that it is no broader than that which the separation of powers doctrine permits" (71 NY2d at 9).  No exceedingly broad grant of authority is present here.  The question before us is solely one of statutory interpretation: whether the DNA Databank Act authorizes the FDS Regulations.  Because it does, *Boreali* is inapplicable.

*v Whalen*, 39 NY2d 510, 515 [1976]), "there is a large field in which the legislature . . . may certainly delegate to others powers which the legislature may rightfully exercise itself" (*Matter of Trustees of Vil. of Saratoga Springs v Saratoga Gas, Elec. Light & Power Co.*, 191 NY 123 [1908] [internal quotation marks omitted]). "The Legislature may constitutionally confer discretion upon an administrative agency [or a commission] . . . if it limits the field in which that discretion is to operate and provides standards to govern its exercise" (*Matter of Levine*, 39 NY2d at 515). So long as the legislature stays within those confines, it enjoys great flexibility in delegating rulemaking powers to administrative agencies in order to meet its policymaking ends. In fact, this flexibility is necessary to the law-making process.

Duly enacted statutes, including those pertaining to administrative action, enjoy a presumption of constitutionality (*see Matter of County of Chemung v Shah*, 28 NY3d 244, 262 [2016]). We note that the Commission has promulgated regulations governing both full and partial DNA matches and has done so without challenge to the legislature's power to delegate rulemaking authority concerning access to, operation of, and restrictions on dissemination of information derived from the Databank. The Commission's original regulations defined "matches" as direct matches, where the sample matched a record in the Databank with an extremely high degree of certainty (*see* Partial Match Policy at 5). Because the Databank Act delegated to the Commission the authority to determine what constituted a match, a claim that the legislature lacked the power to delegate rulemaking authority in this area to the Commission cannot turn on the particular definition of "match" chosen by the Commission.

B

The only real question on this appeal is whether the legislative grant of authority in the Databank Act delegated to the Commission the power to issue regulations concerning access to and use of the information stored in the Databank.

The legislature's policy determinations and limiting guidelines are evident from the plain text of the Databank Act and its structure. Although the petitioners characterize the statutory authorization to promulgate forensic DNA policy as granted to or shared with the DNA Subcommittee, a small group of mostly out-of-state scientists, and complain that the legislature could not have intended to delegate to such people the promulgation of rules as to the purposes for which the Databank could be accessed, the statutory scheme is not as petitioners describe it.

The DNA Subcommittee has a narrowly prescribed mandate: to provide the Commission with specialized expertise on the science of DNA forensics. The DNA Subcommittee's authority to promulgate "binding" recommendations to the Commission is limited to specifically enumerated, highly technical areas pertaining to testing standards and accreditation. Our dissenting colleagues point to Subcommittee (not Commission) minutes that describe its recommendation to adopt the FDS Regulations as "binding" (dissenting op at 9). But the Attorney General at oral argument stated that those recommendations were not treated by the Commission as binding and, in any event, petitioners have not challenged the adoption of the regulations based on that alleged

procedural error. Regardless, the Databank Act expressly confines the Subcommittee's authority to promulgate a "binding recommendation" to narrowly delineated topics.[4]

In contrast, the Databank Act authorizes the *Commission* to "promulgate a policy for the establishment and operation of a DNA identification index consistent with the operational requirements and capabilities of the [DCJS]" (Executive Law § 995-b [9]). Unlike the DNA Subcommittee, the Commission is composed of a diverse array of 14 criminal justice stakeholders (§ 995-a [1]-[2]) including the Commissioner of the DCJS (subd [1] [a]), the Commissioner of the Department of Health (or her designee) (*id.*), and 12 additional members appointed by the governor, almost all of whom either are determined ex officio or must first be nominated by others (subds [1] [b]; [2]). Of the 12 appointed members:

> "(a) one member shall be the chair of the New York state crime laboratory advisory committee;
>
> "(b) one member shall be the director of a forensic laboratory located in New York state;

---

[4] *Compare* Executive Law § 995-b (2-a) (granting DNA Subcommittee sole authority to grant, deny, review or modify a DNA forensic laboratory's accreditation), (13) (b) ("The DNA subcommittee shall make binding recommendations for adoption by the commission addressing minimum scientific standards to be utilized in conducting forensic DNA analysis including, but not limited to . . . population studies and methods employed to determine probabilities and interpret test results"), *with id.* ("The DNA subcommittee shall assess and evaluate all DNA methodologies proposed to be used for forensic analysis, and make reports and recommendations to the commission as it deems necessary"); (9) (requiring the Commission to *consult* with the DNA Subcommittee to promulgate a policy for the establishment and operation of the DNA Databank), (13) (d) (authorizing the DNA Subcommittee to advise the Commission on "any other matters referred to it by the commission").

"(c) one member shall be the director of the office of forensic services within the [DCJS];

"(d) two members shall be a scientist having experience in the areas of laboratory standards or quality assurance regulation and monitoring and shall be appointed upon the recommendation of the commissioner of health;

"(e) one member shall be a representative of a law enforcement agency and shall be appointed upon the recommendation of the commissioner of criminal justice services;

"(f) one member shall be a representative of prosecution services who shall be appointed upon the recommendation of the commissioner of criminal justice services;

"(g) one member shall be a representative of the public criminal defense bar who shall be appointed upon the recommendation of an organization representing public defense services;

"(h) one member shall be a representative of the private criminal defense bar who shall be appointed upon the recommendation of an organization of such bar;

"(i) two members shall be members-at-large, one of whom shall be appointed upon the recommendation of the temporary president of the senate, and one of whom shall be appointed upon the recommendation of the speaker of the assembly; and

"(j) one member, who shall be an attorney or judge with a background in privacy issues and biomedical ethics, shall be appointed upon the recommendation of the chief judge of the court of appeals" (subd [2]).

The composition of the Commission shows that the legislature carefully delineated between the DNA Subcommittee, which was composed of experts to provide scientific standards, and the Commission, which was entrusted with the promulgation of nonscientific regulations concerning when and by whom requests for matches could be made, what information could be released, what measures would be required to ensure data

security, and how to balance the need for legitimate uses of the information with privacy interests. Consistent with the distinction between the Commission and the DNA Subcommittee, the Commission is also charged with "designat[ing] one or more approved methodologies for the performance of forensic DNA testing" (§ 995-b [11]). The Executive Law defines "DNA testing methodology" to include not only "methods and procedures used to extract and analyze DNA material" but also "the methods, procedures, assumptions, and studies used to draw statistical inferences from the test results" (§ 995 [3]).[5]

Most importantly, the Act gives the Commission—not the DNA Subcommittee—the authority to "[p]romulgate standards for a determination of a match between the DNA records contained in the state DNA identification index and a DNA record of a person

---

[5] As part of its analysis, the dissent describes the Commission's mandate as "develop[ing] minimum standards and a program of accreditation for all forensic laboratories in in New York" (dissenting op at 25, quoting Executive Law § 995-b [1]). However, when earlier describing the Commission's mandate, the dissent correctly acknowledges that the Commission is also charged with "promulgat[ing] a policy for the establishment and operation of a DNA identification index" (dissenting op at 5, quoting Executive Law § 995-b [9]). Although the dissent agrees that the legislature empowered the Commission to promulgate policies for the establishment and operation of a DNA identification index (dissenting op at 23), it nakedly asserts that "familial search is not part of the DNA identification index" (*id.*) and the "mere[] . . . authority to approve new testing methodologies" does not encompass familial searches (*id.*). But a "methodology" is "a particular procedure or set of procedures" (Merriam-Webster.com Dictionary, methodology [https://www.merriam-webster.com/dictionary/methodology]), which the familial search rules are. The Databank Act does not say that the index is limited to direct matches, partial matches, familial matches or any other type of match. Instead, it charges the Commission with determining what a "match" is (*see* Executive Law § 995-b [12]) and authorizes use of the Databank for "law enforcement identification purposes" (§ 995-c [6] [a]).

submitted for comparison therewith" (§ 995-b [12]).[6]  The statute clearly provides that the

definition of "match" is to be determined by the Commission.  If questions related to ethics,

privacy, and the practical needs of prosecutors and criminal defense lawyers were not to

figure into the determination of a "match," but matches were to be constrained to a

scientific determination only, the statute would have been constructed in a completely

different way.[7]

       Crucially, in Executive Law section 995-c (6), the legislature defined the limited

purpose for which information in the Databank could be used:

> "DNA records contained in the state DNA identification index
> shall be released only for the following purposes:
>
> "(a) to a federal law enforcement agency, or to a state or local
> law enforcement agency or district attorney's office for law
> enforcement identification purposes upon submission of a
> DNA record in connection with the investigation of the

---

[6] The dissent observes that because the Databank Act does not define the term "match," we must interpret it "according to its ordinary and accepted meaning as it was understood at the time" (dissenting op at 30, quoting *Gevorkyan v Judelson*, 29 NY3d 452, 459 [2017]). That conclusion fails because the Databank Act expressly charged the Commission with defining the term "match" (*see* Executive Law § 995-b [12] [directing the Commission to "Promulgate standards for the determination of a match between the DNA records contained in the state DNA identification index and a DNA record of a person submitted for comparison therewith"]).  That legislative choice necessarily means that the legislature did not expect that "match" would be used in its dictionary sense, but instead empowered the Commission to develop a specialized definition to be used in the context of DNA searches.

[7] When a request for a direct match produces a partial match, it may provide exactly the same information as a familial search, although some familial searches would not be reported as partial matches.  Whether familial search requests may use different software or base matches on a reduced set of alleles is not relevant to the statutory interpretation question, however, because the legislature directed the Commission to determine what constitutes a match.

commission of one or more crimes or to assist in the recovery or identification of specified human remains, including identification of missing persons, provided that there exists between the division and such agency a written agreement governing the use and dissemination of such DNA records in accordance with the provisions of this article"

As the dissent observes, the legislature did not "intend[] for the Databank to be used for any purpose deemed appropriate by the Commission" (dissenting op at 26). But it did intend exactly what it stated in section 995-c (6): the Databank is to be used for "law enforcement identification purposes." The dissent never claims that familial matching falls outside of that statutory authorization. Far from a standardless or overly amorphous grant of lawmaking authority of the sort at issue in *Boreali*, the legislature expressly defined the limited sphere in which the Commission was authorized to promulgate regulations concerning access to and use of information from the Databank.[8] The legislature restricted access to specified law enforcement offices (§ 995-c [6] [a]); only when such offices had a written agreement with the DCJS, consistent with the provisions of the Databank Act (*id.*);

---

[8] We are very reluctant to consider subsequent failed legislation to interpret the meaning of a statute (*see Matter of Oswald N.*, 87 NY2d 98, 103 n 1 [1995] ["(l)egislative inaction, because of its inherent ambiguity, affords the most dubious foundation for drawing positive inferences"], quoting *Clark v Cuomo*, 66 NY2d 185, 190-191 [1985]). The various proposed but unsuccessful legislative efforts concerning familial searches does not bear on the interpretation of the Databank Act, and the failures could just as easily indicate the satisfaction of subsequent legislatures with the Commission's familial search regulations. The FDS Regulations are quite stringent in practice: according to counsel for the Commission, since the Regulations were adopted in October 2017, there have been only 53 requests for familial searches (43 unique applications and 10 reapplications), of which 16 were rejected and only 30 produced matches reported back to the requesting law enforcement agency. In any event, the legislature remains free to expand, constrict, or alter the scope of the regulations, or to expressly remove the Commission's authority to issue those regulations.

only when such offices submitted a DNA sample for comparison; and only for specified purposes, including the investigation of a crime (*id.*). The challenged regulations implement and fully comply with the statutory mandate, including that the information released from the Databank is done only when the request is in connection with the investigation of a crime (or the other two statutory purposes not at issue here).

Indeed, as would be expected from the text of the Databank Act evidencing a legislative concern for the security and privacy of such information, the challenged FDS Regulations sharply limit the universe of data that might be disclosed. In the absence of those regulations—left purely to the statutory language—nothing would restrict requests for familial searches to, for example, instances where a law enforcement agency had not attempted any other means to identify the perpetrator.

The legislative history of the Databank Act further confirms that the legislature intended to delegate to the Commission the power to regulate access to and use of information in the Databank (Assembly Mem in Support, Bill Jacket, L 1994, ch 737 at 5 ["the bill's unprecedented creation of the Commission on Forensic Science, coupled with its specific prescriptions governing the state DNA identification index and use of DNA records, ensures a reasoned approach to the implementation of forensic DNA technology in New York"]), and carefully considered the decision to task the Commission with the duty of safeguarding the sensitive genetic information therein (*see* Budget Report on Bills, Bill Jacket, L 1994, ch 737 at P8 [the Databank Act "prescribes limited circumstances under which records contained in the DNA identification index can be released . . . and provides confidentiality rules, and penalties for inappropriate disclosure of such

confidential DNA records"]).  The legislature contemplated that the Commission would be authorized to promulgate DNA collection and analysis policies and directed the Commission to regulate access to the Databank (Mem of Atty Gen, L 1994, ch 737 at 12 [the Databank Act will "ensure that DNA samples are collected and analyzed so as to enhance law enforcement investigations while not trampling on the rights of innocent individuals"]).

Given the clarity and specificity of the guidelines provided in the Databank Act, respondents acted within their delegated authority.  The FDS Regulations are a result of "administrative rule-making," not "legislative policy-making" (*Matter of Independent Ins. Agents & Brokers of N.Y., Inc. v New York State Dept. of Fin. Servs.*, 39 NY3d 56, 69 [2022]).  Here, the legislature made the policy determination that New York State should have well-developed DNA testing programs to assist law enforcement, that the use of the information should be limited, and the data and results secure.  To achieve those ends, it directed the Commission to promulgate rules and administer that program in accordance with the legislature's defined policy ends, including the protection of privacy interests (*cf. Delgado v State*, 39 NY3d 242, 263-264 [2022]).  That the statute does not expressly mention familial searches is not pertinent; the statutory provisions cited above grant the Commission the power to determine what constitutes a "match" and to establish rules regarding use, dissemination, and confidentiality of information based on matches of DNA samples submitted by law enforcement (*see e.g. Garcia v New York City Dept. of Health & Mental Hygiene*, 31 NY3d 601 [2018] [holding that the Board of Health may require influenza vaccines even though influenza was not expressly listed among the vaccines

required by statute]; *Matter of Levine*, 39 NY2d at 515 [statutory "standards or guides need

only be prescribed in so detailed a fashion as is reasonably practicable in light of the

complexities of the particular area to be regulated"]; *Matter of Sullivan County Harness

Racing Assn. v Glasser*, 30 NY2d 269, 276 [1972] [holding that the statutory authority

granted to the Racing Commission to issue licenses only "in the public interest,

convenience or necessity" and the "best interests of racing generally" properly allowed the

Commission to condition a racetrack's license on the prohibition of televising races]).[9]

---

[9] The decisions cited by our dissenting colleagues are inapposite – they involved the question of whether regulations promulgated under a facially broad grant of authority usurped the legislative function. In *Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene* (23 NY3d 681 [2014]), we held that the authority of the New York City Department of Health (DOH) was not so broad as to permit it to limit the size of soda containers, though would have been broad enough to require labels to show caloric content. Considerations of "economic consequences . . . tax implications for small business owners . . . and personal autonomy" as to what beverages people consume strayed far from the DOH's legislative authorization. Likewise inapposite is the dissent's observation that considerations of privacy were beyond the mandate of the DOH in *Matter of New York Statewide Coalition*: there, the DOH's statutory grant of authority did not mention the protection of privacy interests, whereas the Databank Act contains numerous provisions requiring the Commission to promulgate regulations that protect the privacy interests of individuals (*see* Executive Law §§ 995-b [2] [d], [9] [b] [ii], [9] [b] [iii], [9] [b] [iv], [9] [b] [v], [9] [b] [vi], [9] [b] [viii]; 995-c [6]; 995-d).

By contrast, in *Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv*. (27 NY3d 174) [2016], the Public Health Law demonstrated that the legislature had made the policy decision to limit secondhand smoke in certain areas of the state, "and left it to state agencies to act within the confines of that determination" (*id.* at 183). The Databank Act's grant of regulatory is, in contrast, narrow and specific: it directed the Commission to weigh multiple specified interests, with technical guidance from the DNA Subcommittee, and promulgate rules that achieve the defined legislative goals. The Commission exists to promulgate standards, accreditation, and protect privacy. In choosing to allow, subject to strict restrictions, the use the familial DNA searches, it has defined matches and taken steps to protected privacy exactly as it was authorized to do.

Regulatory agencies are "clothed with those powers expressly conferred by [their] authorizing statute[s], as well as those required by necessary implication" (*Matter of Acevedo v New York State Dept. of Motor Vehs.*, 29 NY3d 202, 221 [2017]). In general, agencies "can adopt regulations that go beyond the text of [enabling] legislation, provided they are not inconsistent with the statutory language or its underlying purposes" (*Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib.*, 2 NY3d 249, 254 [2004]). Because the Databank Act charges the Commission with determining what constitutes a "match" and authorizes the Commission to promulgate regulations that balance the legislative purpose of aiding law enforcement through the use of the Databank with concerns about misuse and security of the Databank and results produced from it, we reject petitioners' challenge to the regulations governing familial searches.

IV.

Petitioners advance an alternative argument that the FDS Regulations are arbitrary and capricious and request that we remand this case to the Appellate Division for consideration of that issue. Petitioners argue that respondents promulgated the FDS Regulations without appropriate consideration of the potentially disproportionate impact of familial searches on Black and Hispanic New Yorkers, and whether the investigatory benefit of using familial searches outweighs that potential disproportionate impact. In article 78 proceedings, a court may not disturb an administrative action unless it finds no rational basis for the agency's action, or that the challenged action was arbitrary and capricious (*see Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns*

*of Scarsdale & Mamaroneck, Westchester County*, 34 NY2d 222, 230 [1974]).  Here, the record demonstrates that respondents promulgated the FDS Regulations only after soliciting and receiving public comment and considering relevant issues, in accordance with their statutory obligations.  Moreover, the regulations have, in practice, resulted in an extremely small number of familial search results provided to law enforcement agencies— about five per year—which evidences the restrictiveness with which the FDS regulations were drawn to protect privacy interests.  No abuse of discretion appears on this record.

Accordingly, the order of the Appellate Division should be reversed, with costs, and the petition dismissed.

LINDLEY, J. (dissenting):

The decision to permit familial searching of the DNA Databank in New York was made by the Commission on Forensic Sciences (Commission) based upon the "binding recommendation" of its DNA Subcommittee pursuant to Executive Law § 995-b (13) (b).

- 1 -

In my view, the legislature did not authorize either the Commission or the DNA Subcommittee to make important policy-laden decisions of this nature, and respondent agencies, in adopting the familial search regulations, "crossed the hazy 'line between administrative rule-making and legislative policy-making' " (*Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn.*, 25 NY3d 600, 610 [2015]). I therefore respectfully dissent.

## I.

To understand the purposes behind the relevant authorizing legislation (i.e., the DNA Databank Act [Executive Law § 995 et seq., L 1994, ch 737]), it may be helpful to review the events that led to its passage. The first successful use of DNA evidence by a prosecutor in the United States came in 1987 during a Florida rape trial, where the defendant was tied to DNA left at the crime scene. The intermediate appellate court upheld the conviction, finding that the DNA evidence in that case was sufficiently reliable to be admitted into evidence (*see Andrews v State*, 533 So 2d 841, 849-851 [Fla. Dist. Ct. App. 1988]). Prosecutors in New York and other states soon began using DNA evidence as well, with mixed results, at least initially.

In 1989, following a three-month *Frye* hearing, the trial judge in *People v Castro* (144 Misc 2d 956, 979 [Sup Ct, Bronx County 1989]) ruled that, although "DNA forensic identification techniques and experiments are generally accepted in the scientific community and can produce reliable results," certain DNA evidence in that case was inadmissible because the "testing laboratory failed in several major respects to use the

generally accepted scientific techniques and experiments for obtaining reliable results, within a reasonable degree of scientific certainty" (*id.* at 980). The *Castro* case, and others like it, demonstrated the need in New York for an oversight body to ensure the scientific accuracy of DNA testing. In the years that followed, the so-called "DNA Wars" were fought in courtrooms across the country over the accuracy and reliability of DNA testing methods and results (*see* Jay D. Aronson, Genetic Witness: Science, Law and Controversy and the Making of DNA Profiling [2007], at 120-145).

In March 1994, this Court determined that DNA evidence (specifically, the "restriction fragment length polymorphism" [RFLP] methodology) was generally accepted as reliable in the scientific community (*People v Wesley*, 83 NY2d 417, 426 [1994]). The determination in *Wesley* established that the RFLP methodology satisfied the *Frye* standard of admissibility, thus opening the door to widespread use of such evidence in criminal cases, provided, of course, that the laboratory procedures were adequate "to assure the accuracy and reliability of its testing results" (*id.*).

Several months later, "[i]n direct response to this Court's green light in *People v Wesley* [] for the introduction of DNA profile evidence" (*People v Williams*, 35 NY3d 24, 50 n 1 [2020] [DiFiore, J., concurring]), the legislature enacted the DNA Databank Act, which created the Commission on Forensic Science and "a subcommittee on forensic DNA laboratories and forensic DNA testing," i.e., the DNA Subcommittee (Executive Law § 995-b [13] [a]). The Act also authorized the establishment of the DNA Databank for the

collection and storage of DNA from people convicted of certain enumerated felonies ("designated offenders").

Pursuant to Executive Law § 995-a, the Commissioner of the Department of Criminal Justice Services (DCJS) sits as Chair of the Commission, which has oversight over all forensic evidence, and the Governor appoints 12 of its 14 members.[1] The Chair of the Commission then appoints the Chair of the DNA Subcommittee, who, based on recommendations from the Commissioner of Health and the DCJS Commissioner, selects the DNA Subcommittee's other six members, all of whom must have expertise in either molecular biology, population genetics, forensic science, or "laboratory standards and quality assurance regulation and monitoring" (§ 995-b [13] [a]).

## II.

Executive Law § 995-b (1) directs the Commission to "develop minimum standards and a program of accreditation for all forensic laboratories in New York State, including establishing minimum qualifications for forensic laboratory directors and such other personnel as the [C]ommission may determine to be necessary and appropriate, and approval of forensic laboratories for the performance of specific forensic methodologies." The objectives of the Commission in developing minimum standards and a program of accreditation are to:

---

[1] In addition to the Commissioner and the 12 members appointed by the Governor, the Commission is further comprised of "the commissioner of the department of health or his or her designee," who serves as an "ex-officio member of the [C]ommission" (Executive Law § 995-a).

"(a) increase and maintain the effectiveness, efficiency, reliability, and accuracy of forensic laboratories, including forensic DNA laboratories;

"(b) ensure that forensic analyses, including forensic DNA testing, are performed in accordance with the highest scientific standards practicable;

"(c) promote increased cooperation and coordination among forensic laboratories and other agencies in the criminal justice system;

"(d) ensure compatibility, to the extent consistent with the provisions of this article and any other applicable provision of law pertaining to privacy or restricting disclosure or redisclosure of information, with other state and federal forensic laboratories to the extent necessary to share and exchange information, data and results of forensic analyses and tests; and

"(e) set forth minimum requirements for the quality and maintenance of equipment" (§ 995-b [2]).

The statute further provides that the Commission, "in consultation with the DNA [S]ubcommittee, shall promulgate a policy for the establishment and operation of a DNA identification index consistent with the operational requirements and capabilities of the division of criminal justice services" (Executive Law § 995-b [9]). The "index" is another term for the Databank, which has been expanded over the years by the legislature to include DNA from people convicted of all felonies and Penal Law misdemeanors (*see e.g.* L 2004 ch 136; L 1999, ch 560).

The DNA Subcommittee, for its part, is authorized to "assess and evaluate all DNA methodologies proposed to be used for forensic analysis, and make reports and recommendations to the commission as it deems necessary" (Executive Law § 995-b [13]

[b]). Pertinent to this appeal, the Subcommittee shall also "make binding recommendations for adoption by the [C]ommission addressing minimum scientific standards to be utilized in conducting forensic DNA analysis including, but not limited to, examination of specimens, population studies and methods employed to determine probabilities and interpret test results" (*id.*).

As can be surmised from its provisions, the DNA Databank Act was designed by the legislature to address "[o]ne of the major criticisms of the use of DNA evidence in prosecution" at the time, which was "the lack of minimum standards for laboratories that did DNA testing" (George H. Barber & Mira Gur-Arie, New York's DNA Databank and Commission of Forensic Science: An Analysis of Chapter 737 of the Laws of 1994, [1994], at 5).  The legislative history shows that the idea behind the establishment of the DNA Databank was that convicted felons were likely to reoffend, and having their DNA in the Databank might help solve future crimes (*see* New York State Law Enforcement Council, Letter of Support, Bill Jacket L 1994 ch 737 at 29; State of New York, Department of Law, Mem of Support, Bill Jacket L 1994, ch 737 at 11; District Attorney, Queens, New York, Letter of Support, Bill Jacket L 1994 ch 737 at 36).  Although the DNA Databank Act infringed upon the designated offenders' genetic privacy rights, the designated offenders were deemed to have a diminished expectation of privacy due to their prior criminal conduct (*see Nicholas v Goord*, 430 F3d 652, 669 [2d Cir 2005]).

For the first two decades or so of its existence, the DNA Databank was used for its intended purpose, i.e., to compare DNA recovered from crime scenes with the genetic

profiles of designated offenders in the Databank to look for matches, which, if found, would lead the police directly to the perpetrator. In October 2017, however, DCJS permitted a new use of the Databank when it promulgated the familial search regulations at issue herein.

## III.

Familial searching generally refers to the "deliberate search of a DNA database conducted for the intended purpose of potentially identifying close biological relatives to the unknown forensic profile obtained from crime scene evidence" (Allison Murray et al., Familial DNA Testing Current Practices and Recommendations for Implementation, 9 INVEST. SCI. J. 1, 2 [2017]). Instead of targeting convicted criminals whose DNA is already stored in the database, all of whom have been eliminated as suspects following an unsuccessful search for direct genetic matches, familial searching targets their siblings, parents and children, many of whom has never committed a crime. And familial searching can identify multiple people in the Databank who may be related to the perpetrator. "[F]amilial searches generate only leads, which in turn point to a list of possible suspects, all but one of whom definitely did not leave the evidence" (Erin Murphy, Relative Doubt: Familial Searches of DNA Databases, Michigan Law Review, Vol. 109-291, at 313 [2010]). Thus, almost by definition, most suspects investigated by the police as a result of a familial DNA search are innocent.[2]

---

[2]As respondents acknowledge, so far only two people investigated by the police as a result of familial searching in New York have been arrested.

The use of familial searching as an investigatory tool was developed in the United Kingdom in the early 2000's, leading to the arrest and conviction of several violent criminals (Family Ties: The Use of DNA Offender Databases to Catch Offenders' Kin, 34 J. L. Med & Ethics 248 [2006]). In 2009, California became the first state to expressly permit familial searching of its DNA database, followed by Colorado the next year. By 2014, after several other states had adopted familial search policies, the legislature in New York began to consider its use here. Bills to amend the DNA Databank Act to permit familial searching were proposed and submitted in the Assembly in 2014, 2015, 2016, 2017 and 2018, but none made it out of committee (*see e.g.*, 2014 Assembly Bill 9247, 2015 Assembly Bill 1515). In the Senate, a bill to authorize the use of familial searching was introduced in December 2016 and then again in early 2017. The Senate approved the bill in February 2017 by a vote of 49-11 (S-2956A), but the bill, after delivery to the Assembly, died in committee (A-683).

Meanwhile, over in the executive branch, the Acting Commissioner of DCJS (the Commissioner) received a letter in December 2016 from the Queens County District Attorney requesting that the Commission authorize the use of familial searching of the DNA Databank. The District Attorney referenced the unsolved murder of a Howard Beach woman who was found to have male DNA under her fingernails, on her neck and on her cell phone. The genetic profile extracted from that DNA did not match any profiles in the

state Databank, and the District Attorney wanted to know whether the perpetrator might instead be related to someone in the Databank.[3]

The DCJS Commissioner referred the request to the DNA Subcommittee, which held a joint public meeting with the Commission on February 10, 2017 to consider the use of familial searching of the Databank. Following that joint meeting, members of the Subcommittee met in small groups (less than a quorum so as not to run afoul of the Open Meetings Law) and drafted proposed regulations permitting familial searching as well as an implementation plan. The Subcommittee approved the regulations and plan on March 27, 2017 and forwarded them to the Commission.

On April 12, 2017, the Commission reviewed the proposed regulations and, after discussing various provisions at length, voted to send the regulations back to the Subcommittee with several proposed amendments. The Commission requested that the Subcommittee consider the suggested changes and make a "binding recommendation with regard to the issue of Familial Search; specifically the policy, regulations and implementation plan" (Commission Minutes, 4/12/17).

During a public meeting held on May 17, 2017, the DNA Subcommittee voted unanimously to "make a binding recommendation to the Commission on Forensic Sciences that New York State adopt the familial searching policy as it was amended, as well as the regulations and implementation plan that have been similarly revised to reflect the changes

---

[3] The crime was later solved without the use of familial searching.

in policy" (Subcommittee Minutes, 5/17/17). The Subcommittee also made a binding recommendation to the Commission as to the level of kinship threshold that should be established when conducting a familial search. At that time, only one of the seven Subcommittee members resided in New York State.

On June 16, 2017, the Commission approved the Subcommittee's binding recommendations by a vote of 9-2.[4] Notice of the proposed familial search regulations (FDS regulations), as drafted by the DNA Subcommittee, was published in the state register, thus commencing the statutory 45-day public comment period. According to the state register, the "[S]tatutory authority" for the proposed regulations was Executive Law sections 837 (13), 995-b (9) and 995-b (13). Following receipt of comments from supporters and opponents of familial searching, the FDS regulations became effective on October 18, 2017. The notice of adoption set forth in the state register reflected, once again, that the FDS regulations were promulgated by DCJS pursuant to sections 837 (13), 995-b (9) and 995-b (13) of the Executive Law (39 N.Y. Reg. 3 [10/18/2017]).

I note that, although all states have had DNA databases since 1998, the vast majority do not allow familial searching. The legislatures in several states declined to approve bills to authorize familial searching, while Maryland and the District of Columbia have laws

---

[4] The Commission Chair stated that, due to the binding nature of the Subcommittee's recommendation, the Commission had to either accept the proposed regulations in their entirety or send them back to the Subcommittee. The oxymoronic term "binding recommendation" is not defined in Executive Law article 49-B, so it is unclear whether the Commission had authority to reject the Subcommittee's binding recommendation.

expressly forbidding its use (Md. Code Ann. Pub. Safety § 2-506 [d] [2010]; D.C. Code § 22-4151 [b] [2012]). Only twelve states, including New York (until the Appellate Division's ruling), allow familial searching. The FBI does not use familial searching of its Combined DNA Index System (CODIS), taking the position that it would need authorization from Congress to do so (*see* Ellen Nakashima, From DNA of Family, a Tool to Make Arrests, Wash Post, 4/21/2008). Such authorization has not been forthcoming.

**IV.**

In this proceeding pursuant to CPLR article 78, petitioners sought an order annulling the familial search regulations, among other forms of relief. The petition alleged that respondents, in promulgating the regulations, usurped the legislature's power to enact laws affecting the rights of New York's citizens and exceeded the powers delegated to them by the DNA Databank Act. The petition further alleged that the familial search policy is arbitrary and capricious, primarily because it subjects innocent people, a disproportionate number of whom are African-American, to the risk of police investigation with little corresponding benefit to law enforcement.[5]

In their joint answer, respondents asserted as an objection in point of law that petitioners lacked standing to challenge the FDS regulations because they have not suffered an injury-in-fact and are outside the zone of interests sought to be promoted or protected by the DNA Databank Act (*see generally Matter of Mental Hygiene Legal Serv. v Daniels*,

---

[5] The petition asserted other causes of action that have since been abandoned on appeal (*see generally Webb-Weber v Community Action for Human Servs, Inc*., 23 NY3d 448, 451, n2 [2014]).

33 NY3d 44, 52 [2019]).   According to respondents, petitioners failed to establish an injury-in-fact because they have not been investigated by the police or otherwise suffered any *actual* harm because of the familial search policy, and the risk that they will be harmed in the future is far too remote and speculative to confer standing.

## V.

Although Supreme Court determined that petitioners have standing to sue, it dismissed the petition on the merits, finding that "the adoption of the Regulations were within the broad and 'large scale' delegation of authority from the Legislature to the Division in its enabling statute" (2020 NY Slip Op 300861 [U], 5 [Sup Ct NY County 2020]).   Using the *Boreali* factors as a guide (*see Boreali v Axelrod*, 71 NY2d 1, 11-15 [1987]), the court further determined that respondents, in promulgating the FDS regulations, did not overstep their permissible rule-making authority and cross over into the legislature's policy-making domain.   Finally, the court determined that the regulations have a rational basis and are not arbitrary and capricious.

In a 3-2 decision, the Appellate Division reversed and granted the petition (206 AD3d 88 [1st Dept 2022]).   The majority agreed with Supreme Court that petitioners have standing but concluded that respondents lacked authority to adopt the familial search policy.   Having so concluded, the majority did not address whether the regulations were arbitrary or capricious.   The dissenters would have dismissed the petition on standing grounds alone, noting that "the regulations will not affect petitioners unless many rare conditions are all independently satisfied" (*id*., at 108 [Singh, J. dissenting]).

This appeal ensued.

## VI.

As a threshold matter, I agree with the majority that petitioners have standing to commence this proceeding. I add only that respondents' argument with respect to standing—that the risk of petitioners being investigated by the police as a result of the familial search regulations is too remote and speculative to allow them access to the courts—would, if accepted, mean that the only people who could possibly have had standing to sue were those who were actually investigated by the police before the four-month statute of limitations period expired, which would be no one. That would be contrary to this Court's admonition that common-law standing rules should not be applied " 'in an overly restrictive manner where the result would be to completely shield a particular action from judicial review' " (*Matter of Sierra Club v Village of Painted Post*, 26 NY3d 301, 311 [2015], quoting *Matter of Association for a Better Long Is., Inc. v New York State Dept. of Envtl. Conservation*, 23 NY3d 1, 6 [2014]).

Respondents do not dispute that their position on standing would effectively close the courthouse doors to everyone who seeks to challenge the familial search regulations in an article 78 proceeding, thereby erecting "an impenetrable barrier to any judicial scrutiny" of the FDS regulations in that context (*Colella v Bd. of Assessors of Cnty. of Nassau*, 95 NY2d 401, 410 [2000] [internal quotation marks omitted]; *see Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801, 814 [2003] ["our duty is to open rather than close the door to the courthouse"], *cert denied* 540 US 1017 [2003]). Nor do respondents dispute

that petitioners have a heightened risk of being investigated by the police as compared to the general public.[6] Instead, respondents suggest that the legality of their regulatory actions will not entirely evade judicial review because a person charged criminally as a result of familial searching could challenge the regulations in a suppression motion.

But respondents assume that criminal defendants have standing to seek suppression of evidence obtained following disclosure to the police that they are related to someone in the Databank whose DNA is a partial match with forensic DNA, a position rejected by the Appellate Division (*Stevens*, 206 AD3d at 100-101). The only criminal court in New York to consider the legality of familial searching in the context of a suppression motion concluded that the defendant—who relied on the Appellate Division's determination in this case that the FDS regulations were unlawfully promulgated—lacked "standing to invoke the exclusionary rule to suppress the statements and the DNA evidence obtained because of the investigative efforts taken after the familial DNA search" *(People v Williams*, 77 Misc 3d 782, 785 [Sup Ct, Monroe County 2022]). Regardless, it would be incongruous if, as respondents assert, the only people who may challenge the legality of the familial search policy are those who have been charged with committing a heinous crime, while law-abiding citizens like petitioners have no such right.

**VII.**

---

[6] Indeed, it would seem that no one would have a higher risk than petitioners, except perhaps someone who has two first-degree relatives in the Databank.

To the extent that we may address petitioners' third cause of action, alleging that the FDS regulations are arbitrary and capricious, I readily agree with the majority that it lacks merit.[7]  As can be seen from recordings of the various public meetings that are incorporated by reference into the record, members of the Commission and the DNA Subcommittee carefully balanced competing policy considerations to formulate rational regulations allowing familial searching under limited circumstances subject to the approval of the DCJS Commissioner.  Inasmuch as I agree with the majority on standing and the arbitrary and capricious cause of action, this appeal turns on petitioners' cause of action alleging that respondents, in allowing familial searching, exceeded the scope of powers delegated to them by the legislature under the DNA Databank Act.[8]

It is well settled that "[a] governmental agency exceeds the scope of its delegated authority in promulgating a regulation when it engages in impermissible 'legislative policy-making,' as opposed to permissible 'administrative rule-making' " (*Matter of Independent Ins. Agents & Brokers of N.Y., Inc. v New York State Dept. of Fin. Servs*., 39 NY3d 56, 69 [2022], quoting *Boreali*, 71 NY2d at 11).  Because the line between policy-making and rule-making actions is often difficult to discern, this Court, for the past 35 years, has

---

[7] The Appellate Division did not reach this issue.  Petitioners therefore ask that, if we disagree with the Appellate Division on the first cause of action, we remit the matter for resolution of their arbitrary and capricious claim (brief for respondents at 62).

[8] Given the dormant status of the nondelegation doctrine (the US Supreme Court has not invalidated a statute on that ground since 1935), I agree with the majority that the legislature could have delegated to respondents the authority to make important policy decisions on the level of allowing familial searching if it had wanted to do so.

consistently used the *Boreali* factors as a guide to resolve challenges to administrative action (*see e.g. Garcia v New York City Dept. of Health & Mental Hygiene*, 31 NY3d 601, 609 [2018]; *Matter of Acevedo v New York State Dept. of Motor Vehs.*, 29 NY3d 202, 222 [2017]; *Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv.*, 27 NY3d 174, 179 [2016]).

The factors to consider under *Boreali* are "whether (1) the agency did more than balanc[e] costs and benefits according to preexisting guidelines, but instead made value judgments entail[ing] difficult and complex choices between broad policy goals to resolve social problems; (2) the agency merely filled in details of a broad policy or if it wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance; (3) the legislature has unsuccessfully tried to reach agreement on the issue, which would indicate that the matter is a policy consideration for the elected body to resolve; and (4) the agency used special expertise or competence in the field to develop the challenged regulation[]" (*NYC C.L.A.S.H.*, 27 NY3d at 179-180 [internal quotation marks and citations omitted]; *see Boreali*, 71 NY2d at 12-14).

"Any *Boreali* analysis should center on the theme that 'it is the province of the people's elected representatives, rather than appointed administrators, to resolve difficult social problems by making choices among competing ends' " (*Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene*, 23 NY3d 681, 697 [2014], quoting *Boreali*, 71 NY2d at 13).

Here, Supreme Court found that the *Boreali* factors weighed in respondents' favor and concluded that the Commission did not engage in impermissible policy-making when adopting the FDS regulations. The Appellate Division disagreed, concluding that the *Boreali* factors overwhelmingly favored petitioners and that respondents exceeded their rule-making authority in allowing familial searching. Respondents contend that the Appellate Division erred in applying the *Boreali* factors as a guide to determining whether they had authority to promulgate the regulations. This is so, respondents reason, because the DNA Databank Act clearly grants them such authority, which should end the analysis. As petitioners point out, however, respondents failed to make that argument to the trial court. Indeed, respondents addressed the *Boreali* factors and argued that all four of them weighed in their favor.

The majority agrees with respondents that the *Boreali* factors do not inform our analysis, and it would "exile *Boreali* " (*Matter of LeadingAge N.Y., Inc. v Shah*, 32 NY3d 249, 282 [2018] [Wilson, J.,dissenting]) to an island of cases involving "exceedingly broad and nonspecific" grants of legislative authority (majority op at 10, n 3). The majority instead focuses its analysis exclusively on whether the legislature's grant of authority to the Commission in the DNA Databank Act is broad enough to include the power to permit familial searching. The Appellate Division addressed that same issue at length during its consideration of the first *Boreali* factor, ultimately concluding that the regulations "were made in excess of respondents' authority" (*Stevens*, 203 AD3d at 104), so to an extent the two analyses overlap. Under the circumstances, I see no compelling reason to ignore the

remaining three *Boreali* factors, with the understanding that all four factors are mere guidelines. While *Boreali* involved a broad grant of statutory authority, far different from the specific provisions of the Databank Act, the bottom line remains the same: "the scope of the [agency's] authority under its enabling statute must be deemed limited by its role as an administrative, rather than a legislative body" (*Boreali*, 71 NY2d at 10-11). In any event, I submit that petitioners should prevail with or without guidance from the *Boreali* factors.

With respect to the first *Boreali* factor, it is clear that members of the Commission and DNA Subcommittee, in adopting the FDS regulations, made value judgments on a wide spectrum of public policy issues. The decision to allow familial searching necessitated a balancing of many factors, including society's interest in solving serious crimes against the civil liberty interests of citizens to be free from unreasonable governmental intrusions. Of course, there is also a racial component to consider because the DNA Databank comprises a disproportionate number of African-Americans, meaning that a disproportionate number of African-Americans will likely be investigated by the police as a result of familial searching.

Moreover, although DNA of suspects investigated by the police will never enter the state's Databank unless they are ultimately convicted of a crime (*see* Executive Law § 995-c [9] [b]), any "eliminating" DNA samples obtained from them by the police during the investigation (either by consent or surreptitious collection of abandoned DNA) could well end up in a local DNA Databank (*see* Reclaiming "Abandoned" DNA: The Fourth

Amendment and Genetic Privacy, 100 Northwestern L. Rev 857 [2006]). There are 20 local DNA databanks operating in New York, the largest of which, in New York City, contains more than 31,000 profiles, including those of people who were merely arrested or questioned by the police and not ultimately convicted of anything. The question of what will happen to the DNA of innocent persons from whom samples are obtained by the police is yet another policy issue arising from the use of familial searching. On the other side of the ledger, there is the potential of familial searching to reduce the incidence of wrongful conviction and exonerate those who have already been wrongfully convicted, as well as the assistance it may provide in cases where human remains are unidentified.

The seminal point here is that the Commission, in deciding whether to approve the DNA Subcommittee's binding recommendation to adopt the FDS regulations, necessarily had to make value judgments with respect to the many and varied public policy considerations. The first factor thus militates heavily in favor of petitioners.

The second *Boreali* factor also favors petitioners inasmuch as the legislature, when it passed the DNA Databank Act, provided no guidance regarding how the Databank should be used except to search for suspects among designated offenders. Indeed, familial searching did not exist then and, more importantly, was not even on the horizon as an investigative tool. Thus, the only conceivable use of the Databank at the time it was created was to search for direct matches. It therefore cannot be said that the legislature provided general guidance on familial searching and left it to respondents to determine how and under what circumstances it should be used. Instead, members of the DNA Subcommittee

wrote the FDS regulations on a clean slate, using as guides the familial search regulations from California and Colorado, among other states.

The third factor—whether the "legislature has unsuccessfully tried to reach agreement on the issue"—is, at best for respondents, a push considering that we are reluctant to draw inferences one way or the other from legislative inaction due to its " 'inherent ambiguity' " (*Matter of Oswald N.*, 87 NY2d 98, 103 n. 1 [1995]; *see Acevedo*, 29 NY3d at 202). But the fact that the legislature considered bills to allow familial searching annually from 2014 through 2019 and failed to enact any of them into law certainly does not support respondents' position, as they contend. With respect to the third factor, the *Boreali* Court stated: "The repeated failures by the Legislature to arrive at such an agreement do not automatically entitle an administrative agency to take it upon itself to fill the vacuum and impose a solution of its own" (71 NY2d at 13). That general principle is as valid today as it was back then, and is apropos here.

The remaining factor also supports petitioners inasmuch as the Commission, unlike the DNA Subcommittee, does not have any "special expertise or competence in the field" of familial searching or even DNA evidence in general (*Greater N.Y. Taxi Assn.*, 25 NY3d at 612; *see* Executive Law § 995-b [13] [b]). That is why the legislature created the DNA Subcommittee and gave it authority to make binding recommendations on technical matters to the Commission, which oversees all forensic evidence, not just DNA. In any event, the decision to allow familial searching of the Databank does not require special expertise in DNA evidence; instead, it requires the balancing of myriad policy considerations, a task

that legislators are far better equipped to handle than unelected members of the Commission and DNA Subcommittee, many of whom, although very accomplished in their respective fields, do not even reside in New York.

In sum, while acknowledging that the *Boreali* factors should not to be "rigidly applied in every case" and overlap to some degree (*Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene*, 23 NY3d 681, 696 [2014]), I conclude that they amply support the Appellate Division's finding that respondents did not engage in mere regulatory rule-making when promulgating the FDS regulations and instead made significant policy decisions reserved for the legislature.

## VIII.

The majority does not seem to dispute that respondents engaged in policy-making by permitting familial searching of the DNA Databank. In the majority's view, however, the legislature delegated to the Commission the authority to do so, and the FDS regulations were therefore lawfully promulgated. To reach that conclusion, the majority focuses on the role of the Commission in approving the regulations and relies on various provisions of Executive Law article 49-B as providing the requisite legislative authority for doing so. Specifically, the majority cites to language in Executive Law §§ 995-b (9), 995-b (11), 995-b (12) and 995-c (6), only one of which (§ 995-b [9]) was cited in the state register as statutory authority for DCJS's promulgation of the regulations. As noted, the state register identified §§ 837 (13) and 995-b (13) as the other authorizing statutes, and respondents

should not now be heard to argue that they acted pursuant to statutory authority that they did not actually rely on to adopt the regulations.

For the reasons that follow, I do not think that any of the statutes relied upon by respondents or the majority authorized the DNA Subcommittee to draft the FDS regulations and make a binding recommendation to the Commission that they be approved, nor did they authorize the Commission to approve the binding recommendation or DCJS to ultimately promulgate them.

I will first address the statutes cited in the state register as authorizing promulgation of the regulations. Executive Law § 837 (13) merely provides DCJS with the power to "[a]dopt, amend or rescind such rules and regulations as may be necessary or convenient to the performance of the functions, powers and duties of the division." This ability to promulgate regulations presumes, of course, that the substantive content of the regulations is within the ambit of DCJS's authorized powers. If it were otherwise there would be no limit on the agency's regulatory authority. Perhaps for that reason respondents do not even mention section 837 (13) on appeal.

Respondents' brief does mention section 995-b (13), which was also cited in the state register as statutory authority for the regulations. Indeed, given the prominent role played by the DNA Subcommittee in the process, it appears that the Commission, in approving the regulations, relied primarily on authority set forth in section 995-b (13) (b), which authorizes the DNA Subcommittee to make recommendations to the Commission

with respect to "approved methodologies for the performance of forensic DNA testing" and "make binding recommendations for adoption by the commission addressing minimum scientific standards to be utilized in conducting forensic DNA analysis" (§ 995-b [13] [b]).

But the legislative authorization required to permit the Commission, after a binding recommendation by the Subcommittee, to allow familial searching is a significantly broader authorization than that actually granted by the legislature, which was merely the authority to approve new testing methodologies. In establishing the Subcommittee, the legislature clearly intended to create a technical advisory committee, not a policy-making committee. The Subcommittee, however knowledgeable and experienced its members may be in matters relating to the science of DNA, is not the type of body that the legislature would entrust with authority to make significant policy decisions. For that reason, I conclude that section 995-b (13) (b) did not authorize the DNA Subcommittee to make a binding recommendation on the use of familial searching.

With respect to the Commission's authority to approve the regulations, the majority cites to the Commission's ability to promulgate policies "for the establishment and operation of a DNA identification index," which includes "the forensic DNA methodology or methodologies to be utilized in compiling the index" (Executive Law § 995-b [9] [a]). Although that power was certainly delegated to the Commission, a familial search is not part of the DNA identification index. As the Appellate Division succinctly observed, "[t]he overarching public policy consideration in deciding whether to permit familial DNA testing in the first instance necessarily involves balancing the civil liberty interests of citizens to be free from unreasonable governmental interference against the societal interest of law

enforcement in investigating crimes" (206 AD3d 88, 104 [2022]).  As noted above, the balancing of these competing interests presents a significant social policy question. As defined, a familial search seeks "to indicate potential biologically related individuals to one or more sources of evidence" (9 NYCRR 6192.1 [ab]).

With that precept in mind, I agree with the Appellate Division that the decision of whether or not to allow a familial search does not fall within the Commission's grant of regulatory authority and remains with the legislature.

The majority, however, states that "[t]he Commission exists to promulgate standards, accreditation, and protect privacy" (majority op at 20, n 9).  In so stating, the majority appears to take the position that, because the legislature tasked the Commission with protecting privacy in certain regards, the legislature authorized the Commission to expand the purpose of the Databank so that it could be used to intentionally target people who are outside the Databank and who have never been convicted of a crime. And as far as the protection of privacy is concerned, the DNA Databank Act addresses it in only two instances.  The first is where the statute requires the Commission to include "one member, who shall be an attorney or judge with a background in privacy issues and biomedical ethics" (Executive Law § 995-a [2] [j]).  But requiring a single member of a 14-member Commission to have a background in privacy issues and biomedical ethics is an insufficient basis to determine that the legislature meant for the Commission to expand the scope of DNA searching to look for suspects outside of the Databank.

The other situation in which the DNA statute discusses issues of privacy is in the context of the Commission's duty to "develop minimum standards and a program of accreditation for all forensic laboratories in New York state" (Executive Law § 995-b [1]). It is in that context that the legislature required that one of the objectives "[t]he minimum standards and program of accreditation shall be designed to accomplish" is to

> "ensure compatibility, to the extent consistent with the provisions of this article and any other applicable provision of law pertaining to privacy or restricting disclosure or redisclosure of information, with other state and federal forensic laboratories to the extent necessary to share and exchange information, data and results of forensic analyses and tests" (§ 995-b [2] [d]).

But that is it.  There are no other provisions of the DNA Databank Act where the legislature delegated to the Commission authority to make policy determinations about privacy.  And although the majority focuses on cases cited in this dissent where the Court found that a regulation requiring balancing considerations of " 'economic consequences . . . tax implications for small business owners . . . and personal autonomy' " was  beyond the policy considerations authorized by the legislature (majority op at 20 n 9, quoting *Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene*, 23 NY3d 681 [2014]), *Boreali* itself points to privacy considerations as also being the type of policy considerations that are beyond the scope of regulatory authority unless they are specifically delegated to the regulatory body at issue: "Striking the proper balance among health concerns, cost and privacy interests, however, is a uniquely legislative function" (*Boreali*, 71 NY2d at 12).  The same holds true in this case, inasmuch as the legislature never authorized the Commission to strike the balance

between privacy interests and law enforcement concerns by sanctioning the Commission to expand the purposes for which the Databank is used.

The other provision that respondents and the majority rely on as demonstrating the Commission's authority to approve the FDS regulations is Executive Law § 995-b (9), which provides that "the commission, in consultation with the DNA subcommittee, shall promulgate a policy for the establishment and operation of a DNA identification index consistent with the operational requirements and capabilities of the division of criminal justice services." The fact that the legislature authorized the Commission to establish and operate the Databank does not mean that the legislature intended for the Databank to be used for any purpose deemed appropriate by the Commission.

Nor is authorization for the FDS regulations found in the Commission's mandate is to "develop minimum standards and a program of accreditation for all forensic laboratories in New York state" (§ 995-b [1]). Familial searching has nothing to do with developing minimum testing and accreditation standards. In my view, there are no provisions of Executive Law § 995-b (9) that authorize the Commission to approve an entirely new use of the Databank for investigatory purposes.

This leads to respondents' contention that familial searching is not, in fact, a new use of the Databank and that it is not substantially different from partial matching, which was authorized by the Commission in 2010 (*see* 9 NYCRR 6192.3 [g]) and has gone unchallenged since. According to respondents, the Commission's approval of both familial searching and partial matching is authorized by Executive Law § 995-b (12), which allows

the Commission to "[p]romulgate standards for a determination of a match between DNA records contained in the state DNA identification index and a DNA record of a person submitted for comparison therewith." As noted, however, the state register makes clear that respondents did not act pursuant to § 995-b (12) when approving and promulgating the FDS regulations. Regardless, the statute does not authorize respondents to allow familial searching of the Database.

The fact that no one has challenged the partial matching regulations does not mean that they were lawfully promulgated. But even assuming, for the sake of argument, that partial matching is authorized under the DNA Databank Act, it does not necessarily follow that the same is true for familial searching given the fundamental differences between two types of searches. A partial match is found when, during an unsuccessful search for a direct match between DNA in the Databank and forensic DNA, the searching apparatus inadvertently identifies a designated offender whose DNA closely resembles crime scene DNA, thereby suggesting that the designated offender is closely related to the perpetrator of the crime. Partial matches often arise because the DNA collected from a crime scene is partially degraded or contains mixtures, making it difficult to identify direct matches.

In such cases, the Commission allows laboratories to conduct additional testing with lower stringency standards to determine whether a "near miss" shown by the initial test is in fact a direct match obscured due to the poor quality of the forensic DNA or, instead, whether it shows that the designated offender in question is closely related to the person who left DNA at the crime scene (i.e., a partial match). Until the regulations were amended

in 2010, information regarding partial matches was not shared with law enforcement. With partial matching the Databank is used for its intended purpose (searching for suspects within the indices), and the partial match regulations are essentially just a disclosure policy

With familial searching, in contrast, the Databank is intentionally searched for non-matches (i.e., people who are not designated offenders). In fact, FDS regulations permit familial searching only after the search for a direct or partial match fails (*see* 9 NYCRR 6192.3 [h]), and there is no intent with familial searching to find a direct match. Instead of targeting designated offenders (as is the case with searches for direct and partial matches), familial searching targets relatives of designated offenders. Additionally, familial searching uses fewer genetic markets to compare DNA profiles than do searches for direct and partial matches. The lower stringency search widens the net of designated offenders whose DNA is deemed similar enough to the forensic DNA to make suspects out of their relatives, leading to more false positives than partial matching.

Although section 995-b (12) authorizes the Commission to "[p]romulgate standards for a determination of a match," the FDS regulations allow familial searching only when there is no match or partial match between the forensic DNA and the Databanked DNA. If there is no meaningful distinction between partial matches and "matches" resulting from familial searching, as respondents suggest, then familial searching would never be authorized under the regulations, because there would always be a partial match.

The significant differences between familial searches and partial match searches are discussed in the following history of familial searching:

> "In a May 2006 *Science* article entitled 'Finding criminals through DNA of their relatives,' the authors propose that if a crime stain does not match anyone in the offender database that there is a chance that a relative might be in the database. Since relatives will have similar DNA to one another, loosening the search stringency to permit partial matches rather than full high-stringency matches (where every allele in an STR profile must match) may return a list of results that could include a brother or other close relative. This list of potential relatives could be narrowed through further testing with Y-chromosome markers, which would require all of the potential relatives plus the crime scene sample to be examined with the additional genetic markers. In theory with this approach, the database is effectively enlarged to include close relatives of criminals whose profiles are already on the DNA database.
>
> "The United Kingdom pioneered this partial matching technique, better known as 'familial searching,' and has used it to solve a number of cases—but not without controversy. It is worth noting that during routine searches of a DNA database, partial matches can result from samples that have common STR alleles—particularly with moderate or low stringency searches. Generally speaking, a familial search is a second deliberate search looking for relatives" (John M. Butler, Fundamentals of Forensic DNA Typing 282 [2010]).

Inasmuch as a familial search means that a DNA database "is effectively enlarged to include close relatives of criminals whose profiles are already in the DNA database" (*id*.), even if only temporarily, we should expect that the legislature would have to authorize that temporary expansion of the database at issue here—i.e., the Databank—just as they have felt it necessary to authorize permanent expansions of the Databank in the past. But that is not what was done.

Finally, I note that the term "match" is not defined in article 49-B, so we must construe it "according to its ordinary and accepted meaning as it was understood at the time" (*Gevorkyan v Judelson*, 29 NY3d 452, 459 [2017] [internal quotation marks omitted]; *see People v Eulo*, 63 NY2d 341, 354 [1984]). A "match" in this context is generally understood as something "that is exactly like another" (The American Heritage Dictionary of The English Language, 4th Edition), and its meaning has not likely changed since 1994 when Executive Law § 995-b (12) was enacted. Two things either match or they do not match. If they closely resemble each other, there is no match. When the legislature authorized the Commission to promulgate standards for "a match" with respect to the DNA Databank, it was referring to setting standards for how many genetic markers two DNA profiles have in common such that it may be concluded that the DNA came from the same person. The legislature did not enact section 995-b (12) with the intent that the Commission be allowed to determine in the future how the Databank could be used for as yet unknown investigatory purposes.

I thus conclude that the Appellate Division properly granted the petition and annulled the FDS regulations as being promulgated "in violation of lawful procedure" (CPLR 7803 [3]). The legislature's grant of authority to respondents is not so broad as to permit them to adopt a familial search policy, and whether to permit familial searching of the DNA Databank in New York is a decision that should therefore be made by the people through their elected representatives, not unelected officials in executive agencies.

Order reversed, with costs, and petition dismissed. Opinion by Chief Judge Wilson. Judges Garcia, Singas and Cannataro concur. Judge Lindley dissents in an opinion, in which Judges Troutman and Lynch concur. Judges Rivera and Halligan took no part.

Decided October 24, 2023